[No. 63348-7. En Banc.]
Argued May 14, 1996. Decided November 27, 1996.
THE STATE OF WASHINGTON, *Petitioner,* v. VICKI JO
ATEN, *Respondent.*

*David H. Bruneau, Prosecuting Attorney,* and *Deborah Kelly, Deputy,* for petitioner.

*John F. Hayden* of *The Public Defender's Office*, for respondent.

SMITH, J. — The State of Washington seeks review of a decision of the Court of Appeals, Division Two, which reversed Respondent Vicki Jo Aten's conviction in the Clallam County Superior Court for second degree manslaughter. We granted review. We affirm the Court of Appeals.

## QUESTIONS PRESENTED

The questions presented in this case are (1) whether there was sufficient evidence establishing the corpus delicti, independent of Respondent's own statements, to allow admission of her statements at trial; (2) whether the trial court erred in admitting the statement Respondent made to police officers while she was a patient being treated for grief and depression;[1] (3) whether the trial court erred in admitting the statement Respondent made to police officers taken without an attorney after she made an equivocal request to have an attorney present; (4) whether there was sufficient evidence to find Respondent guilty of second degree manslaughter; and (5) whether the trial court erred in imposing an exceptional sentence above the standard range.

## STATEMENT OF FACTS

Shortly before 10:00 p.m. on January 30, 1991, Respondent Aten arrived at Ms. Rose Gonzales' home to baby-sit Ms. Gonzales' four young children, including four-month-

---

[1]Respondent Aten was diagnosed as having "adjustment reaction with acute grief and depressed mood." Verbatim Report of Proceedings, Trial, at 81.

old Sandra Michelle Biber.[2] Sandra was asleep when Respondent arrived, but Respondent woke her up, held her, then put her back down.[3] At about 10:15 p.m., Ms. Gonzales left for work, leaving her four children with Respondent Aten.[4] The infant Sandra was dead the next morning.

On February 25, 1991 in the Clallam County Superior Court the State charged Respondent Vicki Jo Aten with second degree manslaughter[5] incident to the death of four-month-old Sandra Michelle Biber.

On August 5, 1991 the court, the Honorable Gary W. Velie, conducted a CrR 3.5 hearing to determine admissibility of Respondent's February 10, 1991 statement to police officers about events surrounding the infant's death. The court concluded the statement was admissible. The Findings of Fact and Conclusions of Law and Ruling for the CrR 3.5 hearing was not filed until December 18, 1992.[6] The trial began before the Honorable James D. Roper on December 2, 1991 in the Clallam County Superior Court. Respondent waived her right to a jury trial.[7]

At trial, Ms. Gonzales testified that Respondent babysat for her during the period October 1990 to January 1991. She said her four-month-old infant Sandra's health was fine on January 30, 1991.[8] She said the infant did not cry when Respondent awakened her that night. Two days earlier, on January 28, Ms. Gonzales had taken Sandra to

---

[2]Verbatim Report of Proceedings, Trial, at 12.

[3]*Id.* at 13-14.

[4]*Id.* at 15.

[5]Appellant's Clerk's Papers at 8. *See* RCW 9A.32.070, "A person is guilty of manslaughter in the second degree when, with criminal negligence, [that person] causes the death of another person."

[6]Second Supplementary Clerk's Papers at 3. (Counsel did not file the document until twenty-two months after the CrR 3.5 hearing and one year after trial because counsel did not realize it had not been done until the case was scheduled for hearing in the Court of Appeals, Division Two.)

[7]Verbatim Report of Proceedings, Trial, at 1, 5-7.

[8]*Id.* at 14.

see Dr. John D. Wegmann, M.D. She said the baby had a runny nose and had begun teething.[9] Dr. Wegmann testified he examined Sandra and diagnosed her as having a simple viral upper respiratory infection. He said he felt it was a mild illness and he did not prescribe medication.[10] Sandra primarily had nasal congestion, but her lungs and ears were clear, and she was not feverish.

On January 31, 1991, at about 7:22 a.m., James D. Piatt, a paramedic, and his partner, Phil Riehle, were dispatched to Ms. Gonzales' residence.[11] He testified at trial that he arrived to find Respondent Aten holding Sandra, who was dead.[12] He said Respondent was extremely upset.[13] He examined Sandra and asked Respondent about the infant's prior history. She told him Sandra had been having breathing problems and recently was taken to see a doctor. He understood from her that the doctor examined the baby for the breathing problems. Respondent said she was up all night with the baby from 10:00 until 4:06 in the morning. The Sheriff's Department was then notified about Sandra's death.

Sergeant Monte Martin, Clallam County Sheriff's Department, testified he arrived at the Gonzales residence a little before 8:00 a.m on January 31, 1991. He said Respondent was extremely distraught and quite upset. He asked her what happened. She told him she arrived at the Gonzales home at about 10:00 o'clock the night before, awakened the baby and then had trouble putting her back to sleep. She said the baby finally fell asleep at about four o'clock. Respondent said she awoke at about 7:22 a.m. and discovered the baby was dead.

Detective Jeff Boyd also went to the Gonzales residence

[9]*Id.* at 35.

[10]*Id.* at 67.

[11]*Id.* at 38.

[12]Mr. Piatt testified the child's eyelids were open, her eyes were fixed, with the pupils dilated, and her neck was stiff and board-like (she had "rigor mortis of the neck"). Verbatim Report of Proceedings, Trial, at 41-42.

[13]*Id.* at 46.

on the morning of January 31, 1991. He testified Respondent Aten was "very agitated."[14] He questioned her. She told him Sandra cried all night. She said before four o'clock that morning she gave Sandra a teaspoon of cough syrup diluted with water. She said Sandra finally fell asleep but when she (Respondent) awoke at about 7:15, she found the baby dead on the couch where she had put her down to sleep. Respondent said she immediately called 911. She told Detective Boyd that Sandra had a bad cough, a runny nose, and seemed very congested the night before.[15] She also told him Sandra had trouble breathing that night.[16]

Dr. Richard Schiefelbein, M.D., a pathologist, performed an autopsy on Sandra on January 31, 1991. He testified he found no evidence indicating the infant had been ill. He concluded she died from Sudden Infant Death Syndrome (SIDS) or acute respiratory failure.[17] He explained that acute respiratory failure means a person stops breathing and cannot start breathing again. He said it was possible manual interference or suffocation could set in motion a process leading to respiratory failure in an infant.[18] He acknowledged that once the process was begun, it was still possible to see signs of movement or hear sounds from an infant.[19] He stated that death by manual interference or suffocation was not necessarily detectable in an autopsy. And he could not determine from any autopsy whether the cause of death might have been manual interference or SIDS.[20]

On cross examination, Dr. Schiefelbein stated that quite often babies who died from SIDS had been observed in the

---

[14]*Id.* at 56.

[15]*Id.* at 61-62.

[16]*Id.* at 121-22.

[17]*Id.* at 125.

[18]*Id.* at 127-28.

[19]*Id.* at 128.

[20]*Id.*

preceding weeks to have a respiratory infection. But he said it was merely an association and he would not say such babies were at a higher risk of death from SIDS. Dr. Schiefelbein said he could not conclude a logical and reasonable inference that Sandra died from any human action.[21]

On redirect examination, the State asked Dr. Schiefelbein this convuluted hypothetical question:

> If you are aware, doctor, that a child is alive and well at 10:00 P.M. and that at 7:30 A.M. the next morning the infant of this age is dead, and the person in whose care the child has been placed says that contrary to all other evidence that the child was very, very ill during that time period and you are aware of, again, the child had visited a doctor evidencing no symptoms whatsoever of being very, very ill, the mother having seen the child at 10:00 [P.M.] or even a little bit later, how can you say that it is not a logical and reasonable possibility that the child died from human intervention? Perhaps not the only one but a logical one?[22]

The disjoined answer Dr. Schiefelbein gave to the question, after objections and colloquy between counsel, as well as partial responses from the witness, was:

> I think that it is a reasonable inference but I don't think . . . the autopsy findings per se lead to that inference with that history. But what I guess I'm saying that inference, I guess, I could make that inference—well, I would but not based on the autopsy findings in a way wouldn't contribute to that inference. It would be the history that would be contributing to the inference.[23]

At trial, Sandra's mother, Ms. Gonzales, testified that on or about February 2, 1991, Respondent asked her what the autopsy on the baby showed. Ms. Gonzales said she answered "they thought it was Sudden Infant Death

[21]*Id.* at 130.

[22]*Id.* at 131.

[23]*Id.* at 134.

Syndrome." She said Respondent then told her that was not true.[24]

Respondent's 17-year old daughter, Virginia (Jenda) Barley, testified that around January 31 and the first weeks of February 1991, Respondent put some of her possessions in storage. Her mother asked people to temporarily keep other possessions and gave some of them away. Ms. Barley testified her mother would not say why she was doing it, but did tell her the sheriff might lock the whole house up.[25]

On February 6, 1991 Respondent met with Patrick Downie, the lay bishop of her church.[26] He became concerned for her psychological and emotional condition and arranged immediate contact between her and Peninsula Counseling and a mental health professional.[27] That same day, the mental health professional accompanied Respondent to the Olympic Memorial Hospital where she voluntarily checked herself into the behavioral medicine unit, a locked or secured facility at the hospital.[28] At 10:00 p.m. she was given 50 milligrams of Elavil, an antidepressant medication.[29]

On February 7, 1991 Respondent was seen in the hospital by Dr. Norman F. Peterson, M.D. He diagnosed her as having "adjustment reaction with acute grief and depressed mood"[30] or suffering from grief and depression.

[24]*Id.* at 17.

[25]*Id.* at 140.

[26]Second Supplementary Clerk's Papers at 4. (Findings of Fact from the CrR 3.5 Hearing.)

[27]*Id.*

[28]*Id.* The record indicates a "Dr. Gordon" admitted her to the hospital. Verbatim Report of Proceedings, Trial, at 81.

[29]Verbatim Report of Proceedings, Trial, at 85.

[30]*Id.* at 71. Dr. Peterson also diagnosed Respondent as having a mixed personality disorder.

He felt she was seriously depressed.[31] Dr. Peterson testified he saw Respondent daily during her hospitalization, with the exception of her first day, February 6, and the day she was discharged, February 19.[32] He testified Respondent was not given any medication on February 7, 8 or 9.

On February 10 at 4:30 p.m. Respondent was given a half dose of Librax, an anti-anxiety medication. Dr. Peterson testified that Librax generally had a mild calming effect.[33] He testified he would not expect Librax to impair a person's ability to make judgments or decisions or impair a person's alertness and awareness, but that two possible adverse reactions to the drug could be confusion or drowsiness.[34]

On February 10 or February 11 around 6:00 p.m., Ms. Gonzales visited Respondent in the hospital.[35] She testified that during the visit Respondent told her Sandra had cried all night and she killed the baby by smothering her with a pillow.[36] She told Ms. Gonzales she felt really guilty and had to let it out.

On February 10, between 9:30 and 10:00 p.m., Dr. Norman F. Peterson, M.D. met with Respondent at the hospital. He testified she appeared quiet and calm, which was in contrast to previous days when she appeared more anxious. She also appeared to be oriented to her surroundings. She spontaneously told him "She [Sandra] wore me out. I would have never done that if I had had more sleep. I suffocated her. It's not an excuse. It's just what hap-

---

[31]*Id.* at 81.

[32]See *id.* at 70-71, 73, 88.

[33]*Id.* at 73-74, 86.

[34]*Id.* at 93.

[35]See *id.* at 21, 29.

[36]*Id.* at 23-24.

pened."[37] Dr. Peterson testified Respondent's demeanor was subdued, purposeful, direct, of great seriousness and great clarity while she spoke. He said Respondent showed no sign of being sedated—she had no trouble putting words together, her sentences were complete, and she showed no impairment caused by medicine.[38] She told Dr. Peterson she wanted to speak to "Deputy Monte" and asked Dr. Peterson to telephone him. She also told Dr. Peterson she would need a lawyer, she wanted to tell the true story, and she wanted to make sure it was done legally.[39]

Sergeant Monte Martin testified that on February 10, 1991 at 9:15 p.m. he received a telephone call at home from Sergeant Lenahan, who asked him to telephone Dr. Peterson at the Olympic Memorial Hospital.[40] He called Dr. Peterson, who told him Respondent wanted to speak with him about Sandra's death because she had not told him the whole truth.[41] Sergeant Martin then went to the hospital with Undersheriff Joseph A. Martin.

Sergeant Martin and Undersheriff Martin met with Respondent in a hospital conference room at about 10:35 p.m. on February 10, 1991. No one else was present at the time, although Detective Jeff Boyd joined them later.[42] The conference room was not inside a locked or secured facility, but was down the hall from the locked doors of the behavioral medicine unit.[43] Sergeant Martin testified Respondent appeared calm and alert, and she did not appear to be under the influence of drugs or intoxicants. She

---

[37]*Id.* at 76.

[38]*Id.* at 93.

[39]See *id.* at 88.

[40]*Id.* at 98-99.

[41]*Id.* at 99.

[42]At the CrR 3.5 hearing, Sergeant Martin testified he and the two other officers, Undersheriff Martin and Detective Boyd, were in civilian clothes and not on duty at that time. Verbatim Report of Proceedings, CrR 3.5 hearing, at 73. He also testified he did not have handcuffs with him. And he could not remember whether he was armed. *Id.*

[43]See Verbatim Report of Proceedings, Trial, at 110.

said a couple of times she wanted to get the incident over with.[44] Sergeant Martin turned a recorder on at 10:42 p.m. to begin recording the interview with Respondent.[45] Respondent did not object.

During the recorded interview, Sergeant Martin began reading to Respondent her *Miranda* rights when she asked, "Do I have to have an attorney present?"[46] He told her, "Only if you request one."[47] He then continued to read Respondent her rights, including her right to an attorney, and her right to have one present during questioning. He also read her a waiver of her rights, which read in part: "I do not want an attorney at this time. I understand and know what I am doing."[48] After reading Respondent her rights and the waiver of her rights, Sergeant Martin asked, "Do you understand your Waiver of Rights?" Respondent answered, "Yes I do."

Sergeant Martin then asked Respondent if she wanted to talk to him. She said, "I really do, but I think I better have an attorney present just to see if maybe, ah, I might be messing up somewhere along the line."[49] Sergeant Martin told her, "Okay. With that, I can't talk to you. I'm, I'm held by that unless you want to talk to me." Respondent then asked that the recorder be turned off. It was turned off at 10:45 p.m. Detective Jeff Boyd came into the conference room after the recorder was turned off. While the recorder was off, the officers for a period of 40 minutes answered Respondent's questions about booking procedure, trial procedure, custody of her children, and whether she would have to go to Western State Hospital. Sergeant Martin testified that during that period Respondent did

---

[44]*Id.* at 101.

[45]Ex. 6 at 1. Exhibit 6 is the transcript of the recorded interview.

[46]*Id. See Miranda v. Arizona*, 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966).

[47]*Id.*

[48]*Id.*

[49]*Id.* at 8.

not request an attorney and no attorney issue was brought up in the discussion.[50] At Respondent's request the recorder was turned on again at 11:25 p.m.[51] Respondent agreed she wanted to talk and would sign a waiver of rights. Sergeant Monte Martin conducted most of the interview, but Detective Boyd and Undersheriff Martin asked a few questions.

Respondent gave the officers her version of events on the night Sandra died. She said she arrived at Ms. Gonzales' home at about 10:00 p.m. on January 30, 1991. She went inside and picked up the baby, who was asleep at the time, but then awoke. Respondent said the baby began fussing when she put her back down. The baby had a bad cough and was very sick. Respondent said she put the baby on the couch in the living room where it was warmer. But the baby continued to fuss and cry all night. Respondent said she checked on her throughout the night and was totally exhausted and tired. She said she then gave Sandra her water bottle with a teaspoon of cough syrup in it, but Sandra kept on fussing. Respondent then said, "I'm doing something I don't want to do. But it takes care of the problem . . . I take my hand and I place it over her mouth and her nose and I just hold that for a little while and she calms down. And I lay her down. She's still fussing."[52] Respondent said she then went to bed and noticed by the clock it was 4:06 a.m. She said in the morning Jamie, Ms. Gonzales' seven-year-old daughter, told her the baby was cold. She went to Sandra, flipped her over, and saw she was dead. Respondent then called 911. She said the paramedics and sheriff's officers soon arrived.

In her statement to the officers, Respondent denied using a pillow to suffocate Sandra. She said she put her hand

---

[50]Verbatim Report of Proceedings, Trial, at 109.

[51]Exhibit 6 at 8.

[52]Ex. 6 at 10.

over the baby's chin and nose. and did not hang on for very long. After doing that, she put her down. Sandra was still fussing a little, but had settled down. She said the baby's feet were still moving and she was still breathing when Respondent left the living room. Respondent said Sandra was still alive when she left her. The interview ended and the recorder was turned off at 11:50 p.m.[53]

Sergeant Martin testified Respondent appeared calm during the interview and did not appear to be under the influence of any intoxicant or drug. Detective Boyd testified Respondent looked alert, but somewhat tired. Sergeant Martin said he did not place Respondent under arrest before advising her of her rights and did not advise her during the interview that she was under arrest.[54]

On February 11, 1991 at 12:20 a.m., Respondent was given the sedative Halcyon. Another sedative called Ataban was administered to her on February 12 and February 15 to assist her in sleeping. Respondent was also given three doses of Librax on each day from February 11 through February 15, 1991.[55]

On the morning of February 11, 1991, according to Ms. Jeanine Carson, a CPS caseworker, Respondent telephoned Child Protective Services (CPS) about placing her children in foster care. Ms. Granson testified she spoke with Respondent on the telephone. Respondent told her she had killed the baby, Sandra. She also told Ms. Granson the sheriff's department was going to take her because she confessed to them the night before. Respondent explained to Ms. Granson that she suffocated the baby by putting her hand over its mouth and she did it because the baby

---

[53]In the interview there was reference to a male friend of Respondent who was in the bedroom overnight and who left for work the morning of January 31, 1991. He was not included in the investigation. Neither the State nor the defense mentioned him.

[54]Verbatim Report of Proceedings, Trial, at 112-13.

[55]*Id.* at 86.

was crying all night. Ms. Granson testified Respondent was sobbing toward the end of the conversation.[56]

Dr. Norman F. Peterson testified that on February 11, 1991 nurses reported Respondent was having hallucinations.[57] He spoke to Respondent about it. She said she felt inner inspiration from God through prayer. She denied hearing the voice of God from somewhere outside herself.[58] He concluded Respondent's "hallucinations" were more like a phenomenon or an intense religious experience.

After close of the State's case, Respondent's counsel made a motion to exclude all statements made by Respondent because the State had not established the corpus delicti of the crime with evidence independent of those statements. He also moved to dismiss because the State had not established a prima facie case.[59] The trial court denied both motions. Respondent rested her case without presenting any testimony or other evidence.

On December 3, 1991 the court, the Honorable James D. Roper, found Respondent "guilty" of manslaughter. The Findings of Fact and Verdict of Guilty were entered on March 1, 1993.[60]

The court sentenced Respondent to an exceptional sentence of 36 months on May 1, 1992.[61] The court identified Respondent's abuse of trust and the vulnerability of Sandra Michelle Biber as the two aggravating circum-

---

[56]*Id.* at 52. There is serious question whether a proper foundation was laid for admission of this telephone conversation under ER 901(b)(6). While an objection was initially made by Defendant, it was deferred for later discussion and ruling. There is no indication in the record that this occurred. The testimony was hearsay, nevertheless, and thus unreliable as evidence. *See* ER 801, 802.

[57]*Id.* at 90.

[58]*Id.* at 90-91.

[59]*Id.* at 141.

[60]Plaintiff/Respondent Supplemental Clerk's Papers, March 12, 1993, at 3. (Counsel did not file the document until almost 15 months after the verdict because counsel did not realize it had not been done until the case was scheduled for hearing in the Court of Appeals, Division Two.)

[61]Appellant's Clerk's Papers at 4. The standard range for Respondent was 12-14 months.

stances which justified an exceptional sentence above the standard range.[62] The Findings of Fact and Conclusions of Law for Exceptional Sentence were not entered until March 18, 1994.[63]

On August 22, 1995 the Court of Appeals, Division Two, reversed Respondent's conviction, based upon the corpus delicti issue, and remanded to the trial court for dismissal.

This Court granted review on February 14, 1996. The Court also granted review of issues not addressed by the Court of Appeals, including sufficiency of the evidence, admissibility of Respondent's February 10, 1991 statement to police officers, and the exceptional sentence.

## DISCUSSION

### CORPUS DELICTI RULE

The State contends there was sufficient evidence of the corpus delicti, independent of Respondent Aten's statements, to support a logical and reasonable inference that Sandra's death was caused by a criminal act.

■ ■ *"Corpus delicti"* literally means "body of the crime."[64] In a homicide case, the corpus delicti consists of two elements the State must prove at trial: (1) the fact of death and (2) a causal connection between the death and a criminal act.[65] The corpus delicti can be proved by either direct or circumstantial evidence.[66]

■ ■ In this state, confessions or admissions of a person

---

[62]See RCW 9.94A.390, which lists nonexclusive factors a court may consider in imposing a sentence outside the standard range.

[63]Plaintiff/Respondent Supplemental Clerk's Papers, March 31, 1994, at 3. The court cited RCW 9.94A.390(2)(b) as the basis for the aggravating circumstance of "vulnerability" and RCW 9.94A.390(2)(c)(iv) as the basis for the aggravating circumstance of "abuse of trust." The document was not filed until 22 months after sentencing.

[64]1 McCORMICK ON EVIDENCE § 145, at 227 (John W. Strong ed., 4th ed. 1992).

[65]*State v. Lung*, 70 Wn.2d 365, 371, 423 P.2d 72 (1967) (citations omitted).

[66]See id.; *State v. Thompson*, 73 Wn. App. 654, 659, 870 P.2d 1022, *review denied*, 125 Wn.2d 1014 (1994).

charged with a crime are not sufficient, standing alone, to prove the corpus delicti and must be corroborated by other evidence.[67] Washington courts often cite the traditional statement of the "corpus delicti rule" as in *State v. Meyer*,[68] which provides:

> The confession of a person charged with the commission of a crime is not sufficient to establish the *corpus delicti*, but if there is independent proof thereof, such confession may then be considered in connection therewith and the *corpus delicti* established by a combination of the independent proof and the confession.
>
> The independent evidence need not be of such a character as would establish the *corpus delicti* beyond a reasonable doubt, or even by a preponderance of the proof. It is sufficient if it *prima facie* establishes the *corpus delicti*.[69]

"*Prima facie*" in this context means there is "evidence of sufficient circumstances which would support a logical and reasonable inference" of the facts sought to be proved.[70] The evidence need not be enough to support a conviction or send the case to the jury.[71] But, as the rule indicates, if no such evidence exists, the defendant's confession or admission cannot be used to establish the corpus delicti and prove the defendant's guilt at trial.

■ A majority of jurisdictions follow the traditional corpus delicti rule.[72] The rule arose from a judicial distrust of confessions, coupled with the view that a confession admitted at trial would probably be accepted uncritically

---

[67]*See State v. Vangerpen*, 125 Wn.2d 782, 796, 888 P.2d 1177 (1995); *State v. Riley*, 121 Wn.2d 22, 32, 846 P.2d 1365 (1993); *City of Bremerton v. Corbett*, 106 Wn.2d 569, 574-75, 723 P.2d 1135 (1986)

[68]*State v. Meyer*, 37 Wn.2d 759, 226 P.2d 204 (1951).

[69]*Id.* at 763-64.

[70]*Vangerpen*, 125 Wn.2d at 796 (citing *Corbett*, 106 Wn.2d at 578; *State v. Smith*, 115 Wn.2d 775, 781, 801 P.2d 975 (1990)).

[71]*Id.*

[72]*See* 1 McCORMICK ON EVIDENCE, *supra*, § 145, at 557; 7 WIGMORE ON EVIDENCE § 2071 (Chadbourn rev. 1978).

by a jury, thus making it extremely difficult for a defendant to challenge.[73] "This distrust stems from the possibility that the confession may have been misreported or misconstrued, elicited by force or coercion, based upon mistaken perception of the facts or law, or falsely given by a mentally disturbed individual."[74] The corpus delicti rule protects defendants from unjust convictions based upon confessions alone which may be of questionable reliability.[75]

Before applying the corpus delicti rule in this case, we must determine what evidence constitutes independent proof of the corpus delicti. Respondent made several incriminating and somewhat contradictory statements about the child's death. The Court of Appeals did not consider there was independent evidence establishing the corpus delicti. It held that the rule required corroboration of not just confessions and admissions, but any statement made by the defendant, whether inculpatory, exculpatory or facially neutral.[76] The court noted its holding was contrary to the result in *State v. Wright*, 76 Wn. App. 811, 888 P.2d 1214, *review denied*, 127 Wn.2d 1010 (1995), in which the Court of Appeals, Division One, concluded a defendant's confession was sufficiently corroborated by his earlier false exculpatory statement.[77]

■ The reasoning of the Court of Appeals in this case is consistent with the policy behind the corpus delicti rule. As it points out, "[t]he purpose of the corpus delicti doctrine would be frustrated if the court allowed a false confession to be 'corroborated' by a false admission, or

---

[73]Note, *Proof of the Corpus Delicti Aliunde the Defendant's Confession*, 103 U. Pa. L. Rev. 638, 642-43 (1955). *See Corbett*, 106 Wn.2d at 576.

[74]*Corbett*, 106 Wn.2d at 576-77 (citations omitted).

[75]*Id.* at 576 (citations omitted).

[76]*State v. Aten*, 79 Wn. App. 79, 89, 900 P.2d 579 (1995).

[77]*Id.* at 89 n.20.

even by seemingly innocent statements."[78] It logically follows that Respondent's statements should not be considered independent proof of the corpus delicti in this case.

■ In assessing whether there is sufficient evidence of the corpus delicti, independent of a defendant's statements, this Court assumes the truth of the State's evidence and all reasonable inferences from it in a light most favorable to the State.[79]

■ The death of the infant Sandra proves the first element of the corpus delicti—the fact of death. The question then becomes whether the independent evidence corroborating Respondent's confessions or admissions supports a reasonable and logical inference that the child's death was caused by a criminal act. Respondent was charged with second degree manslaughter. The criminal act charged under RCW 9A.32.070(1) is causing death by criminal negligence.[80] Criminal negligence occurs when one "fails to be aware of a substantial risk that a wrongful act may occur" and that unawareness "constitutes a gross deviation from the standard of care that a reasonable [person] would exercise in the same situation."[81] The corroborating evidence in this case must then support a reasonable and logical inference that Respondent acted in a manner which showed lack of awareness of a substantial risk that a wrongful act might occur and that lack of awareness constituted a gross deviation from reasonable care which resulted in the death of the infant Sandra.

Independent corroborating evidence shows Sandra had a simple viral upper respiratory infection on January 28, 1991. Her lungs were clear and she primarily had nasal

---

[78]*Id.* at 89.

[79]*See Corbett,* 106 Wn.2d at 571; *State v. Neslund,* 50 Wn. App. 531, 544, 749 P.2d 725, *review denied,* 110 Wn.2d 1025 (1988).

[80]Under RCW 9A.32.070(1), "[a] person is guilty of manslaughter in the second degree when, with criminal negligence, [that person] causes the death of another person."

[81]RCW 9A.08.010(1)(d).

congestion. On the night of January 30, 1991, Respondent took care of the four-month-old child. She found the child dead the next morning. Sandra's mother testified her baby's health was fine the night before. After Sandra died, Respondent began storing or giving away some of her possessions. And she was voluntarily admitted to a hospital for grief and depression. Dr. Schiefelbein performed an autopsy on Sandra and concluded that Sandra died of SIDS, which is acute respiratory failure. He acknowledged suffocation could cause acute respiratory failure. But he also testified he could not determine in an autopsy whether acute respiratory failure was caused by SIDS or by suffocation. Based upon the autopsy findings alone, Dr. Schiefelbein could not reasonably and logically infer Sandra died as a result of a criminal act. He could draw that inference only haltingly after considering the medical history of the child.

■ The Court of Appeals in its majority opinion reversed Respondent's conviction. The Court reasoned, "Evidence may lead to a reasonable inference of criminality or it may lead to a reasonable inference of innocence. But evidence that simply fails to rule out criminality or innocence does not reasonably or logically support an inference of either."[82] The State, however, argues there is sufficient independent evidence to prove the corpus delicti because *one* logical and reasonable inference from the evidence is that Sandra died as a result of a criminal act. In her dissent, Chief Judge Karen G. Seinfeld agreed with the State's argument, stating "Although it would be reasonable and logical to draw multiple inferences from this evidence, clearly one reasonable and logical inference is that Aten smothered Sandra . . . . I believe that the majority is applying an incorrect standard."[83]

This Court has not previously addressed directly the issue whether the corpus delicti is established when evi-

---

[82]*Aten*, 79 Wn. App. at 91.

[83]*Id.* at 92 (Seinfeld, C.J., dissenting).

dence independent of a defendant's statements is consistent with reasonable and logical inferences of both criminal agency *and* innocence. But this Court's reasoning in *Bremerton v. Corbett* does support that premise. *Corbett* is a 1986 case involving defendants charged with either driving while intoxicated or being in actual physical control of a vehicle while intoxicated. Explaining the sufficiency of independent evidence to prove the corpus delicti, this Court stated it was not "necessary that the evidence exclude every reasonable hypothesis consistent with petitioners not driving a car."[84]

But *Corbett* is not controlling in this case. Earlier cases from this Court support the reasoning of the Court of Appeals that the corpus delicti is *not* established when independent evidence supports reasonable and logical inferences of both criminal agency and noncriminal cause. We consider this the preferable rule under the facts of this case.

The case of *State v. Lung*[85] involved a defendant who had confessed and was charged with second degree murder. In considering evidence independent of the confession, this Court stated "[t]he final test is whether the facts found and the reasonable inferences from them have proved the nonexistence of any reasonable hypothesis of innocence."[86] The Court confirmed that circumstantial evidence proving the corpus delicti "must be consistent with guilt and inconsistent with an hypothesis of innocence."[87] Accordingly, under *Lung*, since the independent evidence in this case supports a reasonable and logical inference or hypothesis of innocence, that is, that Sandra died of SIDS, that is not sufficient to establish the corpus delicti. This was the standard applied by the Court of Appeals in reversing Respondent's conviction. The State claims the

---

[84]*Corbett*, 106 Wn.2d at 578-79.

[85]*State v. Lung*, 70 Wn.2d 365, 423 P.2d 72 (1967).

[86]*Id.* at 371.

[87]*Id.* at 372.

requirement in *Lung*—that the independent evidence must be inconsistent with any reasonable hypothesis of innocence—"was implicitly rejected in *Bremerton v. Corbett*, 106 Wn.2d 569, 578, 723 P.2d 1135 (1986) . . . ."[88] However, *Corbett* did not reject that principle. Besides, unlike *Corbett*, *Lung* is more analogous to this case because it also involved a defendant charged with causing the death of another person.

In *State v. Little*[89] this Court discussed the corpus delicti rule as it relates specifically to homicide cases:

> In a homicide case, where the life or liberty of a citizen is at stake, and where the guilt of the accused must be established beyond a reasonable doubt, the causal connection between the death of the decedent and the unlawful acts of the respondent [accused] cannot be supported on mere conjecture and speculation. . . .[90]

The totality of independent evidence in this case does not lead to the conclusion there is a "reasonable and logical" inference that the infant Sandra died as a result of criminal negligence and that that inference is not the result of "mere conjecture and speculation."

The diagnosis of SIDS (Sudden Infant Death Syndrome) as the cause of death in this case is inconsistent with a conclusion that the infant died as a result of a criminal act by Respondent. SIDS is defined as "the sudden death of any infant or young child which is unexpected by history and in which a thorough postmortem examination fails to demonstrate an adequate cause for death."[91] SIDS is the leading cause of death for apparently healthy

---

[88]Pet's Supplemental Br. at 17. To support its argument the State also quotes *State v. Smith*, 115 Wn.2d at 783, involving a defendant charged with attempted murder, which reasoned that the corpus delicti rule requires the state to "produce evidence of sufficient circumstances which would support a *logical and reasonable deduction*" of the criminal act.

[89]*State v. Little*, 57 Wn.2d 516, 358 P.2d 120 (1961).

[90]*Id.* at 521 (quoting *State v. Rounds*, 104 Vt. 442, 160 A. 249 (1932)).

[91]Bradley T. Thach, *Sudden Infant Death Syndrome: Old Causes Rediscovered?* 315 New Eng. J. Med. 126 (1986). The National Institute of Child. Health

infants who are between the ages of one week and one year.[92] It usually occurs with infants between two and six months of age. In this case, like most babies who die from SIDS, Sandra was an apparently healthy four-month-old infant. SIDS deaths usually occur in the winter months and during the night.[93] Here, Sandra died in January, a winter month, and also during the night.

In light of applicable law and the facts of this case, we reasonably conclude there was insufficient evidence independent of Respondent's statements to establish the corpus delicti. The Court of Appeals was correct in reversing Respondent's conviction.

The corpus delicti rule has been criticized by courts and legal commentators.[94] At least one writer has warned of the hazards of applying the corpus delicti rule in cases such as this one.[95] Some legal commentators suggest the rule should be abandoned altogether.[96] Instead of the traditional corpus delicti rule, federal courts have adopted

---

and Human Development (NICHD) proposed a more comprehensive definition of SIDS in 1989. It states that SIDS is "the sudden death of an infant under one year of age which remains unexplained after performing a complete postmortem investigation, including an autopsy, examination of the death scene and a review of the case history." Jean Campen, *Statistics Corner, In the Quiet of the Night: SIDS*, INT. J. CHILDBIRTH EDUC., Aug. 1992, at 5.

[92]Jill A. Carlson, *The Psychologic Effects of Sudden Infant Death Syndrome on Parents*, 7 J. PED. HEALTH CARE 77 (1993).

[93]*Id.*

[94]*E.g.*, 1 McCORMICK ON EVIDENCE, *supra*; 7 WIGMORE ON EVIDENCE, *supra*; Thomas A. Mullen, Comment, *Rule Without Reason: Requiring Independent Proof of the Corpus Delicti as a Condition of Admitting an Extrajudicial Confession*, 27 U.S.F. L. REV. 385 (1993); Maria Lisa Crisera, Comment, *Reevaluation of the California Corpus Delicti Rule: A Response to the Invitation of Proposition 8*, 78 CAL. L. REV. 1571 (1990); Julian S. Millstein, Note, *Confession Corroboration in New York: A Replacement for the Corpus Delicti Rule*, 46 FORDHAM L. REV. 1205 (1978); *Developments in the Law—Confessions*, 79 HARV. L. REV. 935 (1966).

[95]Crisera, *supra*, at 1583 ("[I]ndependent evidence of infanticide or child abuse by suffocation is virtually unattainable. . . . Permitting the corpus delicti rule to prevent a trier of fact from considering such valuable evidence [the confession] seems contrary to the interests of justice").

[96]*E.g.*, Crisera, *supra*, at 1595-96; Mullen, *supra*, at 417 ("The corpus delicti rule. . . frequently suffers distortions of such magnitude that a want of intellectual honesty must rank among the costs of maintaining it. The common need

the more relaxed rule that the independent corroborating evidence must tend to establish only the trustworthiness of the confession.[97] An increasing number of state courts have followed this trend.[98] We are not among them.

## ADMISSIBILITY OF CONFESSION

### Voluntariness of Confession and Waiver of Rights

Respondent argues the trial court erred in admitting her February 10, 1991 statement because it was involuntary under the totality of the circumstances. She claims her mental disability from emotional distress and the influence of medication rendered her unable to make a voluntary statement or to waive her rights knowingly, voluntarily, and intelligently.

Under *Miranda v. Arizona*,[99] a confession is voluntary, and therefore admissible, if made after the defendant has been advised concerning rights and the defendant then knowingly, voluntarily and intelligently waives those rights. To be voluntary for due process purposes, the voluntariness of a confession is determined from a totality

---

to work around the rule to achieve justice suggests that justice would be better served by abandoning the rule").

[97]*Opper v. United States*, 348 U.S. 84, 93, 75 S. Ct. 158, 99 L. Ed. 101, 45 A.L.R.2d 1308 (1954).

[98]*State v. Parker*, 315 N.C. 222, 337 S.E.2d 487 (1985); *State v. Buck*, 670 S.W.2d 600, 609-10 (Tenn. 1984); *Stout v. State*, 693 P.2d 617, 622 (Okla. Crim. App. 1984) *cert denied*, 472 U.S. 1022; *State v. Zysk*, 123 N.H. 481, 465 A.2d 480, 483 (1983); *Reynolds v. State*, 168 Ga. App. 555, 309 S.E.2d 867, 868 (1983); *State v. True*, 210 Neb. 701, 316 N.W.2d 623, 625 (1982); *Jacinth v. State*, 593 P.2d 263, 266 (Alaska 1979); *State v. Paris*, 76 N.M. 291, 414 P.2d 512, 514-15 (1966); *Holt v. State*, 17 Wis. 2d 468, 117 N.W.2d 626, 633 (1962) *cert. denied*, 374 U.S. 873 (1963); *State v. Yoshida*, 44 Haw. 352, 354 P.2d 986, 990-91 (1960).

[99]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3d 974 (1966). *Miranda* applies only if a defendant was in "custody" when giving a statement, and the statement resulted from "interrogation." The parties dispute whether a custodial interrogation took place here. For purposes of this memorandum it will be assumed a custodial interrogation occurred when Respondent made her statement to officers on February 10.

of the circumstances under which it was made.[100] Factors considered include a defendant's physical condition, age, mental abilities, physical experience, and police conduct.[101] A defendant's mental disability and use of drugs at the time of a confession are also considered, but those factors do not necessarily render a confession involuntary.[102]

The trial court concluded Respondent's confession was voluntary, and therefore admissible, and entered findings of fact and conclusions of law to that effect.[103] When a trial court determines a confession is voluntary, that determination is not disturbed on appeal if there is substantial evidence in the record from which the trial court could have found the confession was voluntary by a preponderance of the evidence.[104]

Respondent herself on February 10, 1991 asked to speak with law enforcement officers. She was not coerced into speaking with them. There was no evidence that medication affected her decisional capacity at the time she gave her statement. She had been administered Librax, an anti-anxiety medication with a mild calming effect, about six hours before she spoke with law enforcement officers. She took no other medication that day. Two possible side effects of Librax are confusion and drowsiness, but Dr. Peterson testified Respondent was less anxious that day than on the previous three days. She was calm, subdued, purposeful and oriented to her surroundings and herself. She spoke clearly, had no trouble expressing herself and showed no sign of being sedated. Respondent was not medicated on February 7, 8, or 9, the three days before her statement to the officers.

---

[100]*State v. Rupe*, 101 Wn.2d 664, 679, 683 P.2d 571 (1984), *habeus corpus granted in part sub nom. Rupe v. Wood*, 863 F. Supp. 1315 (W.D. Wash. 1994).

[101]*Id.*

[102]*See State v. Ortiz*, 104 Wn.2d 479, 484, 706 P.2d 1069 (1985), *cert. denied*, 476 U.S. 1144 (1986), *and on subsequent appeal*, 119 Wn.2d 294, 831 P.2d 1060 (1992); *State v. Lewis*, 19 Wn. App. 35, 573 P.2d 1347 (1978).

[103]*See* Second Supplementary Clerk's Papers at 3.

[104]*State v. Ng*, 110 Wn.2d 32, 37, 750 P.2d 632 (1988).

Additionally, although Respondent was diagnosed as suffering from grief and depression, there is no evidence that officers deliberately exploited her mental condition to obtain her statement or acted in a way that would overcome her will to resist giving a statement. They did not threaten her or make any promises to her. They did not arrest her before, during or immediately after she gave her statement. Before Respondent gave her statement, Sergeant Martin advised her of her rights, including her right to remain silent, her right to an attorney and her right to have an attorney present. When she made an equivocal request to have an attorney present, Sergeant Martin stopped questioning her. He testified that he and the other officers then answered her questions about trial and booking procedure, about the consequences of her not talking to them, and other issues related to the case. They did not discuss Respondent's right to an attorney. After officers answered her questions, Respondent agreed to speak with them and to sign a waiver of her rights. Respondent does not claim she was coerced into making her statement.

Thus, under the totality of the circumstances, the evidence supports the conclusion of the trial court that Respondent's confession and waiver of her rights was voluntary. However, this does not of itself satisfy requirements of the corpus delicti rule.

*Equivocal Request for Attorney*

Respondent claims the trial court erred in admitting her February 10, 1991 statement because it was given after she made an equivocal request for an attorney which was not honored or clarified by the officers.

According to *State v. Robtoy*,[105] when a suspect who is advised of rights makes an equivocal request for counsel during a custodial interrogation, the interrogating officer must stop the interrogation. The officer may then ask ques-

---

[105]*State v. Robtoy*, 98 Wn.2d 30, 653 P.2d 284 (1982).

tions to clarify the suspect's wishes.[106] But those questions must be strictly limited to clarifying the suspect's request.[107]

Evidence shows Sergeant Martin fully advised Respondent of her rights. He then asked her if she was willing to talk. She answered "I really do, but I think I better have an attorney present just to see if maybe, ah, I might be messing up somewhere along the line." Upon that request, Sergeant Martin informed her he could not talk to her. Under *Robtoy,* Sergeant Martin could have questioned Respondent to clarify her request for counsel, but he was not required to do so. He chose not to do so.

 After Sergeant Martin told Respondent he could not talk with her, she asked that the recorder be turned off. She then asked the officers questions. There was no discussion about her right to an attorney. After the officers answered her questions, she asked them to resume the interrogation without an attorney present. A suspect or an accused who invokes the right to counsel but then initiates further communication or conversation with law enforcement officers without a lawyer is subject to further interrogation.[108] After resuming the interview, Respondent waived her rights orally and in writing.

The trial court correctly concluded Respondent's February 10, 1991 statement was admissible under the applicable law and facts surrounding her equivocal request for an attorney. But this still does not satisfy the requirements of the corpus delicti rule.

### SUFFICIENCY OF EVIDENCE

 Respondent argues the State did not present sufficient evidence at trial to sustain a conviction or to be presented to a trier of fact. In reviewing the sufficiency of

---

[106]*Id.* at 38-39 (citations omitted).

[107]*Id.* at 39.

[108]*E.g., Edwards v. Arizona,* 451 U.S. 477, 484-85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981).

evidence in a criminal case, the question is whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt after viewing the evidence in the light most favorable to the State.[109] "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant."[110]

Admitted at trial were Respondent's statements that she suffocated the infant. She had also indicated she was only trying to calm Sandra, but did not intend to kill her. Dr. Schiefelbein testified the autopsy revealed the infant died of SIDS. But he also hesitatingly stated he might possibly make a reasonable and logical inference the infant died from suffocation when considering the infant's history. Viewing that evidence in the light most favorable to the State, it still can not be concluded there was sufficient evidence at trial for a rational trier of fact to find beyond a reasonable doubt that Respondent caused the child's death through criminal negligence. The corpus delicti issue permeates any conclusion on sufficiency of the evidence. That is the critical issue in this case.

### EXCEPTIONAL SENTENCE

In Respondent's brief to the Court of Appeals, it was argued that the exceptional sentence should be reversed because the findings supporting the sentence were not entered as required by RCW 9.94A.120(3). Respondent also contends the absence of findings made it impossible to review or assign error to them.

RCW 9.94A.120(3) provides that "[w]henever a sentence outside the standard range is imposed, the court shall set forth the reasons for its decision in written findings of fact and conclusions of law." In this case, the find-

---

[109]*State v. Joy*, 121 Wn.2d 333, 338, 851 P.2d 654 (1993) (citations omitted); *State v. Green*, 94 Wn.2d 216, 220, 616 P.2d 628 (1980).

[110]*Joy*, 121 Wn.2d at 339 (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)).

ings of fact and conclusions of law supporting Respondent's exceptional sentence were not entered until March 18, 1994, nearly 5 months after Respondent's brief was filed at the Court of Appeals on October 26, 1993 and 22 months after sentencing. Respondent did not provide supplemental briefing to the Court of Appeals assigning error to those findings.[111] The State addressed the exceptional sentence issue in a supplemental brief to this Court and argued in support of the trial court's findings of fact and conclusions of law for the exceptional sentence. But Respondent does not challenge any of those findings in this Court either. Unchallenged findings are accepted as verities on appeal.[112]

Because we affirm the Court of Appeals, we need not address the exceptional sentence issue.

We affirm the opinion of the Court of Appeals, Division Two, which reversed Petitioner Vicki Jo Aten's conviction in the Clallam County Superior Court for second degree manslaughter, because the corpus delicti was not established by evidence independent of Petitioner's statements.

DOLLIVER, GUY, and SANDERS, JJ., concur.

MADSEN, J. (concurring) — I agree with the majority's conclusion that the evidence in this case is insufficient to establish the corpus delicti of the crime absent Aten's statements. Majority at 662. In light of that conclusion, it is unnecessary for the majority to discuss either the admissibility of Aten's statements under the Fifth Amendment or the sufficiency of the evidence supporting the verdict. I write separately to indicate my disagreement with reaching these issues.

In particular, I am concerned with the substance of the majority's discussion regarding the officers' duty to cease

---

[111]Neither of the parties addressed the exceptional sentence issue in oral argument before the Court of Appeals.

[112]*State v. Allert*, 117 Wn.2d 156, 168, 815 P.2d 752 (1991).

questioning following an equivocal request for counsel. The majority relies on *State v. Robtoy*, 98 Wn.2d 30, 653 P.2d 284 (1982), *cert. denied*, 494 U.S. 1031, 494 U.S. 1061, *reh'g denied*, 495 U.S. 966 (1990) in which this court held that any questioning following an equivocal assertion of the right to counsel is strictly confined to clarifying that request. *Id.* at 39. Here Aten made an equivocal request. In response, the officers turned off the recorder and talked with Aten. They did not talk about her request for counsel but, instead, discussed other subjects for 45 minutes. After that conversation, the officers again advised Aten of her rights under *Miranda* and she agreed to make a statement.

In *Robtoy*, this court stated:

> [W]henever even an equivocal request for an attorney is made by a suspect during custodial interrogation, the scope of that interrogation is immediately narrowed to one subject and one only. *Further questioning thereafter must be limited to clarifying that request* until it *is* clarified.

*Robtoy*, 98 Wn.2d at 39 (quoting *Thompson v. Wainwright*, 601 F.2d 768, 771 (5th Cir. 1979)). Under this analysis, following Aten's equivocal request, the officers were limited to one subject, clarifying Aten's request. Under *Robtoy*, the officers exceeded their authority and Aten's statement was inadmissible.

However, in *Davis v. United States*, 512 U.S. 452, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994) the Supreme Court recently ruled that police officers are not required to stop questioning if a suspect in a criminal investigation makes an ambiguous request for counsel. *Id.* at 2357. In this case, Aten concedes that her request was equivocal. Therefore, pursuant to *Davis*, the officers had no duty to cease questioning.

In light of *Davis*, the majority's reliance on *Robtoy* to resolve the Fifth Amendment issue in this case is questionable, as is its analysis under *Robtoy*.

DURHAM, C.J., and JOHNSON and ALEXANDER, JJ., concur with MADSEN, J.

TALMADGE, J. (dissenting) — While I do not believe the corpus delicti rule is sound for corroboration of confessions,[113] it is the rule in this case because the parties did not argue for the adoption of the federal corroboration rule for admissibility of confessions. But even under the corpus delicti rule as articulated in *City of Bremerton v. Corbett*, 106 Wn.2d 569, 723 P.2d 1135 (1986), Ms. Aten's confession was sufficiently corroborated to be admissible.

The majority's formulation of the corpus delicti rule intrudes unnecessarily on the jury's power to determine credibility of witnesses, and may ultimately preclude confessions in cases of alleged infanticide. For these reasons, I respectfully dissent.

We articulated the rule of corpus delicti in *City of Bremerton* as follows:

> . . . [T]he independent proof is sufficient if it prima facie establishes the corpus delicti, which in this case is met by proof that petitioners were driving or in actual physical control of the vehicle while intoxicated. *The independent evidence need not be sufficient to support a conviction or even to send the case to the jury. Nor is it necessary that the evidence exclude every reasonable hypothesis consistent with petitioners not driving a car. "Prima facie," in this context, means only that there be evidence of sufficient circumstances which would support a logical and reasonable inference that petitioners were driving or in actual physical control of a vehicle.*

*Corbett*, 106 Wn.2d at 578-79 (emphasis added) (citations omitted). *See also State v. Vangerpen*, 125 Wn.2d 782, 796, 888 P.2d 1177 (1995); *State v. Smith*, 115 Wn.2d 775, 781, 801 P.2d 975, *rev'd*, 115 Wn.2d 775, 801 P.2d 975 (1990).

As Judge Seinfeld recognized in her dissent, there is evidence baby Sandra Michelle Biber died while in Ms. Aten's sole custody from acute respiratory failure, and one possible cause of acute respiratory failure is manual interference or the smothering of the child. Judge Seinfeld noted:

---

[113]*See State v. Ray*, 130 Wn.2d 673, 681-688 (Talmadge, J., concurring).

Although it would be reasonable and logical to draw multiple inferences from this evidence, clearly one reasonable and logical inference is that Aten smothered Sandra.

*State v. Aten*, 79 Wn. App. 79, 92, 900 P.2d 579 (1995).

The physician who performed the autopsy on baby Sandra concluded initially that the baby died of SIDS, which is acute respiratory failure. Dr. Schiefelbein also acknowledged suffocation could cause acute respiratory failure. He testified he could not determine in an autopsy whether the acute respiratory failure was caused by SIDS or by suffocation. He did testify, however, that manual suffocation of the child could not be ruled out when the medical history of the child was posed to him in a hypothetical question. Thus, the expert medical testimony and the autopsy findings in this case did not rule out the possibility that Sandra died of manual suffocation at the hands of defendant Vicki Jo Aten.

Under *Corbett*, the corroborative evidence necessary to satisfy the corpus delicti rule does not require every reasonable hypothesis consistent with the confession be ruled out. The majority now holds, however, that corpus delicti cannot be established "when independent evidence supports a reasonable and logical inference of both criminal agency and non-criminal cause." Majority op. at 660.

The majority's formulation of the corpus delicti rule necessarily compels the Court to vigorously intrude into the jury's special province, fact finding. *See* WASH. CONST. art. I, § 21 ("The right of trial by jury shall remain inviolate . . ."); *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 644-45, 771 P.2d 711, 780 P.2d 260 (1989) (the essence of the constitutional right to trial by jury is the jury's fact finding province/function). Issues of credibility are peculiarly for the jury. *See State v. Ortiz*, 119 Wn.2d 294, 311, 831 P.2d 1060 (1992) (reliability of and weight to be given expert testimony is for the jury to decide); *Retail Clerks Health & Welfare Trust Funds v. Shopland Supermarket, Inc.*, 96 Wn.2d 939, 943, 640 P.2d 1051 (1982) (citing *Burke v. Pepsi-Cola Bottling Co.*, 64 Wn.2d 244, 246,

391 P.2d 194 (1964)) (the credibility of witnesses and the weight to be given the evidence are matters which rest within the province of the jury; and, even if the court were convinced that a wrong verdict had been rendered, it should not substitute its judgment for that of the jury so long as there was evidence which supports the verdict).

In *Sullivan v. Louisiana*, 508 U.S. 275, 277, 113 S. Ct. 2078, 2080, 124 L. Ed. 2d 182 (1993), the Supreme Court noted the jury fact finding function has a Sixth Amendment dimension:

> The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. . . ." [W]e [have] found this right to trial by jury in serious criminal cases to be "fundamental to the American scheme of justice," and therefore applicable in state proceedings. The right includes, of course, as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of "guilty."

*Sullivan*, 508 U.S. at 277. In *United States v. Gaudin*, 515 U.S. 506, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995), the United States Supreme Court held it is the jury's place to determine mixed questions of law and fact. It is the jury, and not the court, who is to determine the "materiality" of defendant's false statements and his ultimate guilt or innocence. Where the evidence does not rule out manual suffocation as a cause of Sandra's death, the jury must be allowed to exercise its fact finding function and decide whether the baby died of SIDS or defendant Aten's confession was true.

Moreover, the ultimate result of the majority's opinion is to make proof of infanticide exceedingly difficult. In many factual circumstances, the victim and the defendant may be the only witnesses of the infant's death; the medical evidence of the infant's death may be equivocal. The majority's rule requires certainty in corroborating the

defendant's confession to infanticide that is beyond reasonable possibility.[114]

The present case is a close one. Vicki Jo Aten confessed to the death of Sandra Michelle Biber on a number of occasions in various settings. The evidence of Sandra's death suggested both SIDS, a tragic affliction of newborns, and manual suffocation were possible causes of the infant's death. Given this evidence, a jury should have been able to assess the facts, including Aten's confession to the alleged crime. I would reverse Division Two of the Court of Appeals and reinstate Aten's conviction for second degree manslaughter.

---

[114]Indeed, medical authorities may be far too swift to conclude infant deaths are the result of SIDS. A recent Centers for Disease Control (CDC) study indicated statistics regarding classification of Washington State infant deaths between 1980 and 1994 are distorted because some deaths were attributed to SIDS even in the absence of an autopsy. *See* CDC Morbidity and Mortality Weekly Report (MMWR) October 11, 1996, Vol. 45/No. 40 at 863. CDC recommends, at a minimum, that an infant death not be classified as SIDS related absent a thorough case investigation including performance of a complete autopsy, examination of the death scene and review of the clinical history. *See* Guidelines for Death Scene Investigation of Sudden, Unexplained Infant Deaths: Recommendations of the Interagency Panel on Sudden Infant Death Syndrome, CDC MMWR June 21, 1996, Vol. 45/No. RR-10 at 1.