# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  49158-3-II |
| Respondent, | |
| v. | |
| LARRY JOHN LEE, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, P.J. — Larry John Lee appeals his convictions for second degree felony

murder and second degree criminal mistreatment.  Lee argues that (1) under the corpus delicti

rule, the trial court erred in admitting his incriminating statements; (2) the trial court violated his

CrR 3.3 time for trial rights; (3) the trial court erred in admitting expert testimony; (4) he

received ineffective assistance of counsel; (5) the prosecutor committed misconduct; and (6) the

cumulative error of these errors deprived him of a fair trial.  Lee also raises several issues in his

statement of additional grounds (SAG).  We find neither error nor misconduct, and we affirm

Lee's convictions.

## FACTS

### I.  BACKGROUND

Phillip Carter had developmental delays and was unable to properly care for himself.

Carter required assistance with meals, medications, medical appointments, and basic hygiene.  In

approximately 2010, Carter moved to the Lee Family Home, an adult home care facility owned

by Lee and his wife.

Near the end of 2014, Lee's wife moved out of the Lee Family Home and voluntarily gave up her license for the facility. Carter decided to stay in the home. Lee attempted to obtain an individual provider license to serve as Carter's caregiver. To obtain this license, Lee completed orientation, which included a video detailing an individual provider's obligations as a mandatory reporter. Lee also completed a 70-hour basic training course. But Lee failed his home certification testing, and he did not obtain an individual provider license. Nonetheless, Carter continued to reside with Lee.

On May 15, 2015, Lee called 911 after finding Carter unresponsive. Paramedics responded to Lee's home and found Carter unconscious in a bed soiled with pus, urine, and feces. Carter was transported to a nearby hospital where medical personnel discovered that Carter had several large pressure ulcers covering his body. Carter's wounds were emanating a very strong, foul odor and were severely infected. Carter had multiple deep tissue wounds, including one on his chest that indicated he may have been strapped to his bed. Medical personnel noted that Carter also had severe bruising on his leg that would have rendered him nonambulatory.

Many of the pressure ulcers were surrounded by dead tissue. Some of the ulcers were so deep that they exposed bone. Many of the pressure ulcers had been packed with paper towels. The tissue around Carter's pressure ulcers had developed gangrene, and the paper towels caused infections and bacteria growth in Carter's wounds.

Carter passed away later that evening. The medical examiner determined that bacteria growing in Carter's pressure ulcers entered his bloodstream and caused his death. Medical

personnel noted that Carter's pressure ulcers would have been present for at least two weeks, and his wounds would have been treatable if they had been reported sooner.

Police interviewed Lee, who stated that he was Carter's care provider. Lee said that Carter had fallen a week before his death and had difficulties moving around. Lee also stated that he had noticed small pressure sores on Carter, and he treated them. The State charged Lee with second degree felony murder,[1] with first[2] and second degree criminal mistreatment[3] as the predicate felonies, and first degree manslaughter.[4]

## II. TRIAL

Lee's trial was set for March 24, 2016. On March 24, the State moved to continue Lee's trial to May 31, noting that one of the assigned prosecutors was scheduled for a different trial and an expert witness was unavailable. Lee did not object. Lee's trial counsel stated that "we can live with May 31st, but I would want it as the last continuance." Verbatim Report of Proceedings (VRP) (Mar. 24, 2016) at 4. The trial court granted the State's motion. Lee did not file a CrR 3.3(d)(3) motion objecting to the May 31 trial date.

Lee filed a CrR 3.5 motion to suppress his incriminating statements to police regarding his caretaking functions, arguing that the State failed to establish the corpus delicti of second degree felony murder. The trial court denied Lee's motion.

---

[1] RCW 9A.32.050(1)(b).

[2] Former RCW 9A.42.020(1) (2006).

[3] Former RCW 9A.42.030(1) (2006).

[4] RCW 9A.32.060(1)(a).

No. 49158-3-II

At trial, witnesses testified to the above facts. Melanie Burnam, a wound care nurse, testified about a deep tissue injury on Carter's chest. The following exchange took place:

[BURNAM]: . . . This is right below the breast bone, and that purple area is what we refer to as a deep tissue injury. It happens from pressure, friction or . . . from a mechanical device. . . .
[STATE]: Ms. Burnam, over the course of your experience in investigations and in your training as a wound care nurse, what type of things could cause an injury like this?
[LEE'S COUNSEL]: I would object. It calls for speculation.
THE COURT: I will overrule the objection.
[BURNAM]: There was some mechanical force or something around there that caused that pressure. . . .
. . . .
When there is deep tissue injury like this that is on the front underneath of a breast, my experience is it comes from a strap or some sort of damage around the waist.
[STATE]: And when you say it's in an unusual place, why is that an unusual location?
[BURNAM]: Because it's above the line of the pants. Sometimes they will be caused from briefs, pants, things like that, down around the waist. But the fact that it's only on the front, not on the side, and it's so far up, it's suspicious.

3 VRP at 430-32.

The State also asked Burnam about the severe smell coming from Carter's pressure ulcers:

[STATE]: Now, as a wound care nurse, I imagine that you probably respond to cases involving extensive wounds and probably experience odors routinely; is that correct?
[BURNAM]: Correct.
[STATE]: And how did this case, in the context of your experience, compare to your past experiences?
[LEE'S COUNSEL]: I would object. . . .
THE COURT: Sustained. Rephrase your question, please.
[STATE]: Can you describe the odor with more specificity?
[BURNAM]: It was probably one of the worst—
[LEE'S COUNSEL]: I would move to strike the answer.

3 VRP at 418.

4

The trial court then excused the jury and stated that a comparison of the odor in this case, compared to other cases, may be made "but only insofar as it assists the witness in determining the extent of the injury, or what treatment she needed to do. It cannot be used simply for comparison sake." 3 VRP at 419. After the jury returned to the courtroom, the State continued:

> [STATE]: Ms. Burnam, when we left off, I was asking you about the odor that you were smelling. What does the presence of an odor in a case like this tell you about the course of treatment that you take?
> [BURNAM]: There is a sense of urgency when you smell this type of odor.

3 VRP at 421. Lee did not object. Later, the State asked Carter's treating physician how she came to the conclusion that Carter would not survive. The treating physician stated that Carter "had wounds that were the worst [she] had ever seen in [her] life, and [she] didn't think that those were survivable." 4 VRP at 484. Lee did not object.

Carter's social worker testified that, to obtain an independent provider contract, Lee was required to watch a video and answer questions about mandatory reporting. The social worker clarified that a "[m]andatory reporter is a person that is required by law to report . . . critical condition[s]. If the person is in harm's way, either by themselves or someone else, they are required to report that." 5 VRP at 630.

Lee's mother also testified and stated that Carter had an appointment with his primary care physician in early May. Lee's mother stated that Carter refused to go and that he was awake and well on May 15.

During closing argument, the prosecutor used a PowerPoint presentation that included an "in life" picture of Carter smiling and waving at the beginning and end of the presentation. The picture had been admitted into evidence at trial. The prosecutor did not make any statements about the picture during closing argument, and Lee did not object.

No. 49158-3-II

Later in closing argument, the prosecutor stated:

When [Lee] became an independent provider, he had to go to that training. He had to watch a video on mandatory reporting. When there is any change in condition you report it to a caseworker, you report it to Adult Protective Services, or you could [call] 911 when something is life threatening.

6 VRP at 750-51. Lee did not object.

The jury returned verdicts finding Lee guilty of second degree felony murder and second degree criminal mistreatment. Lee appeals.

ANALYSIS

I. CORPUS DELICTI

Lee argues that the trial court erred in admitting his incriminating statements because the State failed to produce sufficient independent evidence to establish the corpus delicti of second degree felony murder. We disagree.

We review a trial court's corpus delicti determination de novo.[5] *State v. Pineda*, 99 Wn. App. 65, 77-78, 992 P.2d 525 (2000). Under the corpus delicti rule, a defendant's incriminating statements are not admissible unless the State first establishes the crime's corpus delicti by independent evidence. *State v. Brockob*, 159 Wn.2d 311, 328, 150 P.3d 59 (2006). A defendant's incriminating statements alone are insufficient to establish that a crime took place. 159 Wn.2d at 328.

The corpus delicti rule does not require that the State present independent evidence of the underlying felony in a felony murder charge. *State v. Medlock*, 86 Wn. App. 89, 100, 935 P.2d 693 (1997). Instead, the State must present sufficient independent evidence of only the

---

[5] "Corpus delicti" means "body of the crime." *State v. Aten*, 130 Wn.2d 640, 655, 927 P.2d 210 (1996).

homicide. *State v. Burnette*, 78 Wn. App. 952, 956, 904 P.2d 776 (1995). The elements of corpus delicti for a homicide offense are (1) the fact of death and (2) a causal connection between the death and a criminal act. *State v. Aten*, 130 Wn.2d 640, 655, 927 P.2d 210 (1996). These elements may be shown by either direct or circumstantial evidence. 130 Wn.2d at 655.

In determining whether the State has presented sufficient independent evidence under the corpus delicti rule, we assume the truth of the State's evidence, and we review the evidence in a light most favorable to the State. *State v. Hummel*, 165 Wn. App. 749, 759, 266 P.3d 269 (2012). The State presents sufficient independent evidence if it prima facie establishes the corpus delicti of the offense charged. *Brockob*, 159 Wn.2d at 328. To prima facie establish corpus delicti, evidence must support a logical and reasonable inference that a crime occurred. 159 Wn.2d at 329.

Lee contends that because second degree criminal mistreatment is the predicate felony of his second degree felony murder charge, the State was required to present sufficient independent evidence that Lee withheld the basic necessities of life from Carter.[6] But Lee misconstrues the corpus delicti rule as it applies to homicide cases. To prove corpus delicti of felony murder, the State must present sufficient independent evidence of only the homicide. *Burnette*, 78 Wn. App. at 956.

Viewing the evidence in a light most favorable to the State here, the State presented sufficient independent evidence that a homicide occurred. Carter passed away after a severe

---

[6] A person is guilty of first degree criminal mistreatment if he recklessly causes great bodily harm to a dependent person by withholding any of the basic necessities of life. Former RCW 9A.42.020(1) (2006). A person is guilty of second degree criminal mistreatment when he recklessly creates an imminent and substantial risk of death or causes substantial bodily harm by withholding any basic necessities of life. Former RCW 9A.42.030(1) (2006).

infection from multiple untreated pressure ulcers entered his blood stream. Carter was unable to properly care for himself and was unable to leave his bed. The pressure ulcers were large and severe and would have been present at least two weeks before his death. Someone attempted to treat Carter's pressure ulcers with paper towels, and the paper towels contributed to Carter's infection. This person was aware of Carter's wounds, and Carter would not have passed away if his wounds had been reported sooner. This evidence supports a logical and reasonable inference that Carter's death was caused by homicide. Accordingly, the State established the corpus delicti of felony murder by sufficient independent evidence, and Lee's incriminating statements were admissible.

## II. TIME FOR TRIAL

Lee also argues that the trial court violated his CrR 3.3 time for trial rights because the trial court abused its discretion in granting the State's motion for continuance. We do not address Lee's claim of error.

A defendant may raise a claim of error for the first time on appeal if it is a manifest error affecting a constitutional right. RAP 2.5(a)(3). However, CrR 3.3 time for trial violations are not constitutionally based and cannot be raised for the first time on appeal. *State v. MacNeven*, 173 Wn. App. 265, 268, 293 P.3d 1241 (2013). To preserve the right to object to a trial date set outside the time for trial, a defendant must file a motion with the trial court. CrR 3.3(d)(3). A defendant who fails to file a motion under CrR 3.3(d)(3), objecting to the continuance of his trial date, loses his right to challenge the trial date on appeal. *MacNeven*, 173 Wn. App. at 268.

Lee's trial was scheduled to begin on March 24, 2016. On March 24, the State moved to continue Lee's trial to May 31, noting that one of the assigned prosecutors was scheduled to be

in trial for a different case and an expert witness was unavailable. Lee's trial counsel stated that "we can live with May 31st, but I would want it as the last continuance." VRP (Mar. 24, 2016) at 4. The trial court granted the State's motion for continuance and set Lee's trial for May 31. Lee did not object and did not file a CrR 3.3(d)(3) motion objecting to the May 31 trial date.

Lee failed to object to the May 31 trial date and also failed to file a CrR 3.3(d)(3) motion. As a result, Lee lost his right to challenge the trial date as a CrR 3.3 time for trial violation. Accordingly, we do not address Lee's claim for the first time on appeal.[7]

### III. EXPERT TESTIMONY

Lee also argues that the trial court erred in admitting expert testimony because the testimony was speculative and did not assist the jury in understanding the evidence at issue. We disagree.

We review the trial court's admission of expert testimony for an abuse of discretion. *State v. Yates*, 161 Wn.2d 714, 762, 168 P.3d 359 (2007). The trial court abuses its discretion when its decision is manifestly unreasonable or is exercised on untenable grounds or for untenable reasons. *State v. Lewis*, 141 Wn. App. 367, 386, 166 P.3d 786 (2007).

Expert testimony is generally admissible when the expert's testimony would be helpful to the jury in understanding matters beyond the competency of ordinary lay persons. ER 702; *State v. Green*, 182 Wn. App. 133, 146, 328 P.3d 988 (2014). An expert's testimony must be based on sufficient foundational facts. ER 703. Expert testimony that is merely speculative is inadmissible. *State v. Warness*, 77 Wn. App. 636, 643, 893 P.2d 665 (1995). "[I]nadmissible

---

[7] Moreover, our review of the record reveals that the trial court did not violate Lee's CrR 3.3 time for trial rights by granting the State's motion for continuance and setting trial for May 31. *See* CrR 3.3(b)(2).

speculation is not the same as a legitimate opinion regarding what 'could be' the truth, so long as that opinion can be stated with the requisite reasonable scientific probability." 77 Wn. App. at 643. Instead, the expert's lack of certainty goes to the weight of the testimony, and not its admissibility. *State v. Lord*, 117 Wn.2d 829, 853, 822 P.2d 177 (1991).

At trial, the State asked Burnam, a wound care nurse, questions about an abrasion on Carter's chest. Burnam testified that, in her experience, such an injury is *usually* the result of a strap or a mechanical advice and that the nature and location of the abrasion was "suspicious." 3 VRP at 432.

Burnam's response to the State's question as to what "could cause an injury like this" was not speculative. She clearly testified that "[t]here was some mechanical force or something around there that caused that pressure" and "[w]hen there is deep tissue injury like this that is on the front underneath of a breast, my experience is it comes from a strap or some sort of damage around the waist." 3 VRP at 431. This testimony was not speculative. Burnam's testimony was based on her observation of Carter's injuries and her experience as a wound care nurse. Any uncertainty about the cause of Carter's abrasion goes to the weight of Burnam's testimony, and not its admissibility. *Lord*, 117 Wn.2d at 853. Moreover, Burnam's testimony would help an ordinary lay person understand the potential cause of a deep tissue injury in a suspect location. Because Burnam's testimony was based on sufficient foundational facts and would help a lay person understand the possible causes of Carter's abrasion, it was admissible expert testimony. Accordingly, the trial court did not abuse its discretion in admitting Burnam's testimony.

IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Lee argues that he received ineffective assistance of counsel. He raises several arguments, alleging that his trial counsel failed to (1) understand the elements of the crimes (and consequently make erroneous tactical decisions), (2) admit into evidence certain facts he mentioned in opening argument, (3) evaluate the likelihood of conviction and assist Lee in making an informed decision about whether to plead guilty, (4) investigate and interview the State's witnesses (which led to a misrepresentation regarding the cause of Carter's death), and (5) investigate and subpoena Carter's primary care physician. Although many of these allegations are troubling, the record on appeal is insufficient to review many of Lee's contentions. We hold that Lee fails to establish that his trial counsel's failure to call Carter's primary care physician was prejudicial, but we are unable to review the remaining arguments.[8]

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a criminal defendant the right to effective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). We review ineffective assistance of counsel claims de novo. *State v. Binh Thach*, 126 Wn. App. 297, 319, 106 P.3d 782 (2005). When an ineffective assistance claim is raised on appeal, we may consider only the facts contained in the trial record. *State v. Estes*, 188 Wn.2d 450, 467, 395 P.3d 1045 (2017).

To establish ineffective assistance of counsel, a defendant must establish both that his trial counsel's performance was deficient and that the deficiency prejudiced him. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). "Deficient performance is performance falling

---

[8] Because these claims pertain to matters outside the record, the appropriate procedure for addressing Lee's arguments is through a personal restraint petition. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

'below an objective standard of reasonableness based on consideration of all the circumstances.'" 166 Wn.2d at 862 (quoting *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). Prejudice is a reasonable probability that, but for trial counsel's deficient performance, the outcome of the proceedings would have been different. 166 Wn.2d at 862. If a defendant fails to establish either deficient performance or prejudice, our ineffective assistance of counsel inquiry ends. 166 Wn.2d at 862.

Lee argues that his trial counsel was ineffective because he failed to investigate and interview Carter's primary care physician. Specifically, Lee argues that Carter's primary care physician would have testified that Carter had an appointment scheduled two weeks before his death but that Carter cancelled the appointment. We hold that Lee fails to establish that his trial counsel's failure to interview Carter's primary care physician was prejudicial.

To be effective, trial counsel must investigate his case. *State v. Jones*, 183 Wn.2d 327, 339, 352 P.3d 776 (2015). This duty to investigate includes interviewing witnesses. 183 Wn.2d at 339. "While [trial] counsel is not required to interview every possible witness, the failure to interview witnesses who may provide corroborating testimony may constitute deficient performance." *State v. Weber*, 137 Wn. App. 852, 858, 155 P.3d 947 (2007).

At trial, Lee's mother testified that Carter had an appointment with his primary care physician in early May. Lee's mother stated that Carter refused to go.

Assuming that Carter's primary care physician would have had knowledge of his office's schedule and could have testified that Carter's appointment had been cancelled, Lee fails to show that the outcome of his trial would have been different. Carter's primary care physician's testimony would have been cumulative of Lee's mother's statements that an appointment had

been scheduled. In addition, it cannot be said that the primary care physician's testimony would have necessarily bolstered Lee's defense. That an appointment was scheduled and cancelled does not show that Carter was well or that Lee was properly caring for Carter. Instead, this testimony could have undermined Lee's defense by suggesting that Lee cancelled Carter's appointment because Carter was too ill to travel or because Lee was attempting to conceal Carter's injuries. As a result, there is no reasonable probability that, had Carter's primary care physician testified, the outcome of Lee's trial would have been different. Accordingly, Lee fails to show that his trial counsel's performance prejudiced him, and this ineffective assistance of counsel claim fails.

## V. PROSECUTORIAL MISCONDUCT

Lee also argues that the prosecutor committed flagrant and ill-intentioned misconduct by (1) referring to facts not in evidence, (2) eliciting inadmissible testimony after the trial court sustained an objection to that testimony, and (3) inflaming the passions and prejudices of the jury by showing the jury an "in life" picture of Carter during closing argument. We hold that the prosecutor's conduct was not improper.

To establish prosecutorial misconduct, a defendant bears the burden of proving that the prosecutor's conduct was both improper and prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). If a defendant establishes that the prosecutor's conduct was improper, we then determine whether he was prejudiced. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). Where, as here, a defendant fails to object to alleged prosecutorial misconduct, he is deemed to have waived any error unless he shows the misconduct "was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." 174 Wn.2d at 760-

61. To meet this heightened standard, the defendant must show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" 174 Wn.2d at 761 (quoting *Thorgerson*, 172 Wn.2d at 455).

A.      *Reference to Facts Not in Evidence*

Lee argues that the prosecutor committed misconduct by referring to facts not in evidence during closing argument. Specifically, Lee argues that it was improper for the prosecutor to argue that Lee was a mandatory reporter and was required to report Carter's change in condition. We hold that the prosecutor's statements were not improper.

A prosecutor's closing argument is considered in the context of the entire argument, the evidence discussed during argument, the jury instructions, and the issues in the case. *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003). During closing argument, the prosecutor has wide latitude to draw reasonable inferences from the evidence and to express such inferences to the jury. *State v. Turner*, 167 Wn. App. 871, 882, 275 P.3d 356 (2012). However, it is improper for a prosecutor to assert during closing argument facts not admitted as evidence during trial. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 705, 286 P.3d 673 (2012).

At trial, Carter's social worker testified that to obtain an independent provider contract, Lee was required to watch a video and answer questions about mandatory reporting. The social worker continued, clarifying that a "[m]andatory reporter is a person that is required by law to report . . . critical condition[s]. If the person is in harm's way, either by themselves or someone else, they are required to report that." 5 VRP at 630. During closing argument, the prosecutor stated:

14

When [Lee] became an independent provider, he had to go to that training. He had to watch a video on mandatory reporting. When there is any change in condition you report it to a caseworker, you report it to Adult Protective Services, or you could [call] 911 when something is life threatening.

6 VRP at 750-51. Lee did not object.

Lee contends that the record does not support the prosecutor's statements that Lee was required to watch a video concerning mandatory reporting as part of his training to obtain an independent provider license. However, Carter's social worker clearly testified that Lee was required to watch a mandatory reporting training video and answer questions about his mandatory reporting obligation. Accordingly, the prosecutor did not assert facts not admitted as evidence during closing argument and drew reasonable inferences from the evidence admitted at trial. Therefore, the prosecutor's statements were proper.

B.      *Eliciting Improper Testimony*

Lee also argues that the prosecutor committed misconduct by eliciting inadmissible testimony after the trial court sustained an objection to that testimony. We hold that the prosecutor's conduct was not improper.

Prosecutorial misconduct may also occur when a prosecutor repeatedly seeks inadmissible testimony from a witness and repeatedly draws sustained objections from the defendant. *See State v. Alexander*, 64 Wn. App. 147, 154-55, 822 P.2d 1250 (1992).

At trial, the following exchange took place with Burnam, a wound care nurse:

[STATE]: Now, as a wound care nurse, I imagine that you probably respond to cases involving extensive wounds and probably experience odors routinely; is that correct?
[BURNAM]: Correct.
[STATE]: And how did this case, in the context of your experience, compare to your past experiences?
           [LEE'S COUNSEL]: I would object. . . .

15

No. 49158-3-II

> THE COURT: Sustained. Rephrase your question, please.
> [STATE]: Can you describe the odor with more specificity?
> [BURNAM]: It was probably one of the worst—
> [LEE'S COUNSEL]: I would move to strike the answer.

3 VRP at 418.

The trial court then excused the jury and stated that a comparison of the odor in this case, compared to other cases, may be made "but only insofar as it assists the witness in determining the extent of the injury, or what treatment she needed to do. It cannot be used simply for comparison sake." 3 VRP at 419. The State continued:

> [STATE]: Ms. Burnam, when we left off, I was asking you about the odor that you were smelling. What does the presence of an odor in a case like this tell you about the course of treatment that you take?
> [BURNAM]: There is a sense of urgency when you smell this type of odor.

3 VRP at 421. Lee did not object.

Later during the trial, the State asked Carter's treating physician how she came to the conclusion that Carter was not going to survive. The treating physician responded that Carter "had wounds that were the worst [she] had ever seen in [her] life, and [she] didn't think that those were survivable." 4 VRP at 484. Lee did not object.

Lee fails to show that the prosecutor repeatedly sought inadmissible testimony during trial. The prosecutor properly rephrased her question regarding the smell emanating from Carter's wounds after Lee's objection. Moreover, the prosecutor's question to Carter's treating physician did not elicit inadmissible testimony. The prosecutor did not, as before, ask the treating physician to compare the smell of Carter's wounds to past experiences. Instead, the prosecutor asked the treating physician about the symptoms that indicated that Carter would not

16

survive, and the treating physician opined that the wounds were the worst she had seen. Accordingly, Lee fails to show that the prosecutor's conduct was improper.

C.      *Inflaming the Jury's Passions and Prejudices*

Lee also argues that the prosecutor committed misconduct because the prosecutor inflamed the passions and prejudices of the jury by showing the jury an "in life" picture of Carter during closing argument. We hold that the prosecutor's conduct was not improper.

It is improper for a prosecutor to make arguments calculated to inflame the passions and prejudices of the jury. *State v. Thierry*, 190 Wn. App. 680, 691, 360 P.3d 940 (2015). A prosecutor may use graphics in closing argument, but visual aids cannot deprive a defendant of his constitutional right to a fair trial. *State v. Hecht*, 179 Wn. App. 497, 503, 319 P.3d 836 (2014).

During closing argument, the prosecutor utilized a PowerPoint presentation. The presentation included an "in life" picture of Carter smiling and waving, and the picture had been admitted into evidence at trial. Lee did not object. The picture appeared at the beginning and end of the presentation. The prosecutor did not make any statements about the picture during closing argument.

The prosecutor showed the "in life" picture of Carter, but she did not make any statements about the picture, and she did not make any arguments calculated to inflame the passions and prejudices of the jury. Lee fails to show that the prosecutor's conduct in showing an admitted exhibit during closing argument was improper.

VI. CUMULATIVE ERROR

Lee also argues that the cumulative effect of these alleged errors deprived him of a fair trial. The cumulative error doctrine applies when a trial is affected by several errors that, standing alone, may not be sufficient to justify reversal. *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). The cumulative error doctrine does not apply when there are no errors or where the errors are few and have little or no effect on the trial's outcome. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). Because Lee has identified no error on this record, the cumulative error doctrine does not apply.

STATEMENT OF ADDITIONAL GROUNDS

In his SAG, Lee contends that he did not receive a fair trial, was wrongfully charged, and was misrepresented by his attorney. We do not review Lee's claims.

RAP 10.10(c) requires that an appellant inform the appellate court of the "nature and occurrence of alleged errors." We cannot review a SAG claim if it is too vague to properly inform us of the claimed error. *State v. Bluehorse*, 159 Wn. App. 410, 436, 248 P.3d 537 (2011). In his SAG, Lee states: "[I] never got a fair trial for the charges that were charged against me and I feel that I have been wrongfully charged. I also was misrepresented by my attorney." SAG at 1. Lee's claims are too vague to apprise us of the nature and occurrences of the alleged errors. RAP 10.10(c). Accordingly, we do not consider Lee's SAG claims.

We affirm Lee's convictions.

No. 49158-3-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Worswick, P.J.

We concur:

_____
Lee, J.

_____
Sutton, J.