
FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2019 FEB -5 AM IO: 37

IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

STATE OF WASHINGTON, ) No. 77668-1-I
)
    Respondent, ) DIVISION ONE
)
    v. ) UNPUBLISHED OPINION
)
KEOVILAYVANH RINTHALUKAY, )
a.k.a. RICKY K. MOORE, )
)
    Appellant. ) FILED: February 5, 2019
_____ )

ANDRUS, J. — Keovilayvanh Rinthalukay (a.k.a. Ricky K. Moore) appeals his conviction for identity theft, contending his out-of-court statement should have been excluded under the corpus delicti rule. He also challenges his convictions for unlawful fish accounting and unlawful possession or sale of shellfish. We reverse his identity theft conviction and affirm the other two convictions.

<u>FACTS</u>

Rinthalukay owns Sea Native USA Ltd., a company that processes and sells fish and shellfish. Any company engaged in the wholesale buying, selling, or processing of fish and shellfish in Washington must obtain a wholesale dealer's license issued by the Washington Department of Fish & Wildlife (WDFW). Once a company obtains a dealer's license, a company representative

must acquire a wholesale fish buyer's card, a permit required to buy directly at the dock from the person who caught the fish. A person cannot obtain a buyer license without being affiliated with a company holding a wholesale dealer license. Sea Native was licensed as a wholesale dealer, and Rinthalukay was licensed as the company's fish buyer.

When a wholesale fish buyer purchases fish or shellfish directly from a fisher, he must fill out a "fish receiving ticket" or "fish ticket" to document the sale. WDFW and the Northwest Indian Fisheries Commission (NWIFC) use these tickets to track commercial harvesting throughout Washington State. The fish tickets document the identities of the buyer and fisher, date of the sale, location of the catch, type of species harvested, quantity harvested, price per pound for each species, and total cost of the product.

The fish receiving ticket is a quintuplicate carbon copy form typically filled out by the buyer by hand, but part of the form is completed by using an "imprinter card." Fishers and dealers are issued license cards, which have raised type like credit cards. If it is a wholesale buyer card, it identifies the wholesale dealer's name and number, while individual buyer cards have an additional line identifying the fish buyer's number. The information from these cards is transferred to the receiving tickets by rubbing a credit-card imprinting machine across the raised surface of the cards. An imprint of the fisher's card transfers the fisher's name, tribal affiliation (if applicable), and his or her identifying serial number onto the fish receiving tickets. There are two sections at the top of each fish ticket—the

left side is used to imprint the fisher's card; the right side is used to imprint the dealer's or buyer's card.

A wholesale fish buyer who is the "original receiver" of fish or shellfish[1] is legally required to complete the fish ticket and distribute copies to the appropriate parties. WAC 220-352-090, -130. The buyer must retain the top copy and distribute the second copy to WDFW, the third copy to NWIFC, the fourth copy to the tribe, and the last copy to the fisher. The buyer must mail WDFW's copy no later than six business days after completing the ticket.[2] WDFW gives dealers some leniency to account for potential mail slowdowns and considers tickets late if they are received on the ninth business day after they were completed. Failing to document purchases with fish receiving tickets or failing to submit copies of the fish tickets to WDFW is a gross misdemeanor. RCW 77.15.630.

WDFW began investigating Rinthalukay after receiving a referral from the National Marine Fishery Service, a subdivision of the National Oceanic and Atmospheric Administration (NOAA). WDFW Detective Wendy Willette obtained a warrant to search both Sea Native's packing facility and Rinthalukay's home. WDFW found 50 fish receiving tickets bearing Rinthalukay's name as buyer and documenting fish or shellfish purchases, none of which had been reported to WDFW.

---

[1] The "original receiver" is the person who holds a wholesale fish buyer endorsement and is the first person in possession of fish or shellfish in the state of Washington who is acting in the capacity of a buyer. WAC 220-352-010(12).

[2] For a treaty Indian fish receiving ticket, WDFW's copy is sent to NWIFC, which then sends WDFW its copy.

WDFW learned that Sea Native stored frozen fish and shellfish at Rainier Cold Storage. A search of Rainier Cold Storage led to the discovery of five boxes, or approximately 200 pounds, of frozen geoduck. Although WAC 246-282-080 requires shellfish for human consumption be packed in approved containers and stamped with a Washington State Department of Health certification ticket, only one box of geoduck had the certification ticket attached. Under RCW 69.30.110(1) and 69.30.140, possession of a commercial quantity of shellfish packed without the approved Department of Health tag is a gross misdemeanor.

During the search of Rinthalukay's home, WDFW also found fish receiving tickets purporting to document May 2014 sales of Dungeness crab from Jean Leon Torres, a member of the Skokomish Indian Tribe, to Rinthalukay. These tickets bore an imprint of Torres's fisher card and what looked like her signature. All the tickets had the WDFW, NWIFC, tribal, and fisher's copies still attached.

The State contended at trial that when Detective Willette interviewed Rinthalukay, he admitted using Torres's imprinter card, signing Torres's name on the tickets, and creating the tickets to document fake sales to reach the required threshold to pass an inspection for a NOAA overseas export certificate. Rinthalukay admitted he created the tickets to mislead the NOAA inspector.

The State charged Rinthalukay with one count of unlicensed first degree fish dealing in violation of RCW 77.15.620,[3] one count of first degree unlawful

---

[3] This charge was based on the fact that Sea Native's and Rinthalukay's wholesale licenses lapsed for a short period of time during which the State alleged they continued to purchase fish.

fish and shellfish catch accounting in violation of RCW 77.15.630(2), one count of unlawful possession or sale of shellfish in violation of RCW 69.30.110(1) and 69.30.140, and one count of identity theft in the second degree, in violation of RCW 9.35.020(1) and (3).

The jury acquitted Rinthalukay of unlicensed fish dealing but found him guilty of the other three charges. The trial court sentenced Rinthalukay to 60 days for the unlawful accounting conviction concurrent with 2 months for the identity theft conviction, each to be served on work release. The court deferred for 12 months a sentence of unsupervised probation for the misdemeanor of unlawfully possessing geoduck. Rinthalukay appeals his judgment and sentence.

ANALYSIS

Rinthalukay raises four arguments on appeal. First, he challenges the evidentiary basis for the identity theft conviction under the corpus delicti rule. He also contends his conviction for unlawful fish accounting should be reversed because the evidence was insufficient to prove he was the "original receiver" of the fish. Rinthalukay also challenges the unlawful possession of geoduck conviction, arguing there was insufficient evidence to prove that he, rather than his company, possessed the product. Finally, Rinthalukay contends that RCW 77.15.630 and RCW 69.30.110 are unconstitutionally vague.

A. Identity Theft

Rinthalukay argues the trial court erred in admitting his statement to investigators, that he forged Torres's signature to mislead the NOAA inspector, under the corpus delicti rule. We agree.

In Count 4, the State alleged:

> [T]he defendant . . . did knowingly obtain, possess, use or transfer a means of identification or financial information, to-wit: the name and tribal affiliation of another person, living or dead, to-wit: Jean Leon Torres, knowing that the means of identification or financial information belonged to another person, with the intent to commit, or to aid or abet, any crime and obtained an aggregate total credit, money, goods, services, or anything else of value that was less than $1500 or obtained no credit, money, goods, services, or anything of value.

The State alleged Rinthalukay created fish tickets using Torres's imprint card and forged her signature because he was applying for a NOAA export certificate to send the products overseas, and he needed to document a certain amount of purchases or sales of product to pass a NOAA inspection. The State contended he used Torres's identification for the purpose and the intent to commit a crime, specifically to commit forgery or to make a false or misleading statement to a public servant.[4]

Rinthalukay argued at trial any statements he gave to WDFW investigators were inadmissible, under the corpus delicti rule, to prove identity theft unless Torres appeared to testify at trial because the State had no independent evidence of an intent to commit forgery or make false statements to NOAA. The State contended the fish tickets themselves were evidence of a crime for three reasons. First, the tickets purported to document sales of Dungeness crab in May 2014, and a Skokomish tribal biologist, Jonathan Wolf, would testify that there was no tribal crab fishery open in May 2014. Second, the

---

[4] The trial court instructed the jury on the elements of forgery and making a false or misleading statement to a public servant.

State contended the fish tickets established a crime had been committed because it was a crime for a fish dealer to purchase crab out of season, although he was not charged with that crime. Third, the State contended the fish tickets, with all five copies intact, also evidenced the crime of unlawful fish accounting.

The trial court ruled that the evidence of fish receiving tickets found in Rinthalukay's house, each bearing the imprint of Torres's card and Rinthalukay's signature, and that the evidence that no copies of the tickets had been distributed to anyone as required by regulation was sufficient to satisfy the corpus delicti rule and allow the State to introduce at trial his statements to Detective Willette.

We review de novo the trial court's ruling as to whether sufficient corroborating evidence exists to satisfy the corpus delicti rule. State v. Hotchkiss, 1 Wn. App. 2d 275, 279, 404 P.3d 629 (2017), review denied, 190 Wn.2d 1005, 413 P.3d 9 (2018). We assume the truth of the State's evidence and all reasonable inferences from that evidence in a light most favorable to the State. State v. Cardenas-Flores, 189 Wn.2d 243, 264, 401 P.3d 19 (2017) (internal quotation marks omitted) (quoting State v. Aten, 130 Wn.2d 640, 658, 927 P.2d 210 (1996)).

"Corpus delicti means the body of the crime and must be proved by evidence sufficient to support the inference that there has been a criminal act." State v. Brockob, 159 Wn.2d 311, 327, 150 P.3d 59 (2006) (internal quotation marks omitted). A defendant's incriminating statement alone is not sufficient to establish that a crime took place. Id. at 328. The State must present "evidence independent of the incriminating statement that the crime a defendant described

in the statement actually occurred." Id. While the independent evidence need not be sufficient to support a conviction, it "must provide prima facie corroboration of the crime described in a defendant's incriminating statement." Id.

We start our analysis with the crime the State contends was described by Rinthalukay in his statement. During WDFW's investigation, Detective Willette asked Rinthalukay about his association with Torres. Rinthalukay told Detective Willette he made a copy of Torres's Bureau of Indian Affairs imprint card because he did not "trust [her] character." He initially denied ever purchasing fish or shellfish from Torres.

When Detective Willette showed Rinthalukay the fish tickets bearing Torres's name found in a briefcase in Rinthalukay's car, he stated he used the records to pass a NOAA inspection. He stated he asked Torres "to do me favor to generate these record." Rinthalukay told Detective Willette he used the fish tickets during a NOAA audit to show that his company, Sea Native, had processed Dungeness crab through its plant. He admitted he had arranged with Torres to create the fish tickets to show to the NOAA inspector even though there was no actual purchase. After initially denying he signed Torres's name to the tickets, Rinthalukay eventually admitted he signed her name to all five tickets without her knowledge.

Rinthalukay contends the State had no independent evidence he intended to forge Torres's signature or to mislead NOAA. We agree.

- 8 -

A person commits forgery when, with the intent to injure or defraud, he possesses a written instrument which he knows to be forged. RCW 9A.60.020. In addition, knowingly making a false or material misleading statement to a public servant is a gross misdemeanor. RCW 9A.76.175. Both crimes require evidence of intent—intent to injure or defraud either Torres or NOAA, or intent to mislead NOAA.

As it did at trial, the State relies on the fish tickets themselves as evidence of Rinthalukay's intent to commit a crime. The five copies of the tickets were intact, meaning Rinthalukay had not forwarded the sales documentation to WDFW as required by law. The fish tickets could be evidence of the crime of unlawful fish accounting under RCW 77.16.630, but that crime is not the crime Rinthalukay described to Detective Willette. Under Brockob, the evidence must corroborate "not just a crime but the specific crime with which the defendant has been charged." 159 Wn.2d at 329. Evidence of unlawful fish accounting does not corroborate an intent to defraud Torres or NOAA, or to mislead NOAA.

Moreover, the State had no evidence the crab purchases reflected in the tickets actually occurred. If no fish or shellfish were landed, there is no violation of the fish accounting statute. As Rinthalukay stated at trial, "[n]o crime could be committed by filling out fish receiving tickets and then never using them." The evidence supports the inference Rinthalukay filled out fish tickets, but without Rinthalukay's statements to Detective Willette, it is pure speculation as to his intent in doing so.

The case is thus analogous to Brockob. In that case, the Supreme Court reversed Brockob's conviction for possession of ephedrine with intent to manufacture methamphetamine. Id. at 319-20. It concluded the evidence against Brockob supported the inference he intended to steal Sudafed but did not support an inference he intended to manufacture methamphetamine, the crime with which he had been charged. Id. at 331-32. Similarly, the fish tickets here may support the inference that Rinthalukay filled out the fish tickets using Torres's imprint card, but they do not by themselves corroborate the allegation that Rinthalukay used Torres's imprint card with the intent to commit a forgery or to mislead NOAA.

The State also relies on evidence that the date on the fish tickets, May 2014, was outside of any tribal crab season. The State argues that this evidence supports only one logical inference—that Torres would not have fished for crab during the season closure, thereby establishing Rinthalukay's intent to commit the crime of forgery. But, the State had no admissible evidence that Torres did not use her imprint card on the fish tickets or sign them herself. "Intent may not be inferred from evidence that is patently equivocal." State v. Vasquez, 178 Wn.2d 1, 8, 309 P.3d 318 (2013) (internal quotation marks omitted) (quoting State v. Woods, 63 Wn. App. 588, 592, 821 P.2d 1235 (1991)). The mere possession of fish tickets purporting to bear Torres's signature and an impression of her card is insufficient to infer intent to commit forgery.

We know nothing about Torres and whether she would or would not poach crab, or whether she would or would not sign fish tickets for Rinthalukay outside

of a tribal crab season. Prima facie corroboration exists if the independent evidence supports a reasonable and logical inference of the facts the State seeks to prove. Brockob, 159 Wn.2d at 328. The trial court inquired of the State if it had any independent evidence from someone familiar with Torres's signature that the handwriting on the form was not hers. The State conceded it had no such evidence. Without some evidence Torres did not sign the fish tickets herself or did not give Rinthalukay permission to use her imprinter card, we cannot infer Rinthalukay intended to commit forgery.

The State proffered evidence that Torres reported to the Skokomish Tribe she did not sell fish or shellfish to Rinthalukay, she did not use her imprinter on any fish tickets for him, and she did not sign the forms. However, Torres did not testify at trial. Her statements to third parties were, therefore, inadmissible hearsay, insufficient to corroborate Rinthalukay's incriminating statement. See State v. Ryan, 103 Wn.2d 165, 178, 691 P.2d 197 (1984) (reversing conviction because corpus delicti not established when hearsay statements were only evidence other than defendant's confession); cf. State v. Ackerman, 90 Wn. App. 477, 485, 953 P.2d 816 (1998) ("Admissible hearsay statements are sufficient to corroborate a confession.") (emphasis added); State v. Biles, 73 Wn. App. 281, 285, 871 P.2d 159 (1994) (same). We, thus, cannot consider this proffer in our assessment of the sufficiency of the State's corroborating evidence.

We reverse Rinthalukay's identity theft conviction because the independent evidence was insufficient to corroborate his incriminating statements to investigators.

B. Unlawful Fish Accounting

Rinthalukay argues the State did not prove he was the "original receiver" of the fish because Sea Native was the entity that took possession of the fish. As a result, he argues there was insufficient evidence that he was responsible for submitting the fish tickets. We disagree.

In a sufficiency of the evidence challenge, this court draws all inferences from the evidence in favor of the State and against the defendant. State v. Smith, 155 Wn.2d 496, 501, 120 P.3d 559 (2005). We uphold a conviction and find sufficient evidence where a rational trier of fact could find that all elements of the crime were proved beyond a reasonable doubt. Id.

The jury was instructed that a person is guilty of unlawful fish and shellfish catch accounting in the first degree:

> when he or she is licensed as a wholesale fish dealer or fish buyer, or is not so licensed but is acting in such a capacity, receives fish or shellfish for a commercial purpose, intentionally fails to submit the fish receiving ticket to the Department of Fish and Wildlife as required by statute or Department of Fish and Wildlife rule, and the value of the fish or shellfish involved is $250 or more.

(emphasis added); see RCW 77.15.630.

The regulations require that the "original receiver" of the fish has the obligation to properly distribute the fish receiving tickets to all entities, including WDFW. See WAC 220-352-090, 220-69-240. The original receiver is defined as "the first person in possession of fish or shellfish who is acting in the capacity of a buyer." WAC 220-352-010(12).

At trial, Marjorie Morningstar, the commercial harvest data manager for WDFW testified that Detective Willette gave her a list of 50 fish receiving tickets seized from Rinthalukay's home and Sea Native's offices to see if WDFW had received its copy of those tickets. Morningstar searched both by Sea Native's company name—including its previous name, Sea Ltd.—and by the 50 individual ticket numbers, confirming WDFW had not received its copy of any of the 50 tickets.[5]

Detective Willette testified that her investigators discovered several fish receiving tickets in Rinthalukay's truck that showed Rinthalukay was the fish buyer. These tickets were intact, meaning each still had copies intended for the appropriate regulatory agency affixed to them. Detective Willette also found other improperly processed fish receiving tickets, showing Rinthalukay as the buyer with the State's and NWIFC's copies still attached, in several locations— including the trash can in the office at the Sea Native plant, on the main desk at the Sea Native plant, in the portable container in the garage at Rinthalukay's home, and on a desk in Rinthalukay's home office. Each of the tickets not properly submitted to WDFW identified Rinthalukay as the buyer, and each bore both his signature and buyer's card number.

Finally, the State presented witnesses who testified they caught fish or shellfish and sold it directly to Rinthalukay at the dock.

This evidence is more than sufficient to prove that Rinthalukay was acting in the capacity of a fish buyer, even if he was buying on behalf of Sea Native. He

---

[5] Ultimately, the State only prosecuted 12 of the 50 tickets.

went to the docks and bought fish directly from the fishers. He took possession of the fish he purchased. He documented the purchases by filling out the fish tickets with his fish buyer card number, identifying himself as the buyer, and signing each ticket. The evidence also showed that Rinthalukay was almost solely responsible for all corporate actions taken in Sea Native's name. Some of the fish tickets in question were found at Rinthalukay's home, further blurring the line between Rinthalukay and Sea Native. A rational trier of fact could find that Rinthalukay was the original receiver of the fish and that he failed to distribute the receiving tickets to the regulatory agencies per the regulations. Therefore, we affirm the jury's finding that Rinthalukay was guilty of unlawful fish accounting.

C. Unlawful Possession or Sale of Shellfish

Next, Rinthalukay argues that he cannot be criminally liable for possessing untagged geoduck because it was Sea Native, and not he, who possessed the untagged geoduck. He also argues that he cannot be guilty under the accomplice liability statute. Neither of these arguments is supported by the facts or the law.

Washington State regulations incorporate the US Food and Drug Administration's National Shellfish Sanitation Program (NSSP) requirements that harvested shellfish be identified by an approved certification tag with permanent marking. WAC 246-282-080(2). Robin Banes, a shellfish inspector with the Washington State Department of Health, testified that the certification tags, which must always be affixed to the container, identify where the shellfish was harvested, the date it was harvested, the amount that was harvested, and the

company that harvested it. Banes explained another purpose of the certification tags is to identify the conditions that were present for that particular lot of shellfish because the biotoxin levels[6] in a particular area can change from day to day.

Randall Klein, plant manager for Rainier Cold Storage, testified that the company received six cases of unfrozen geoduck from Sea Native. Sergeant Erik Olson, with WDFW police, testified that of the six boxes, only one bore the required Department of Health certification tag. Even that box's label, however, was incomplete as it was missing the quantity and the original shipper information.

The jury instruction required either that Rinthalukay knowingly possessed a commercial quantity of untagged geoduck or that Sea Native possessed the geoduck and that Rinthalukay was legally accountable for Sea Native's actions. See RCW 69.30.110(1); WAC 246-282-080. Because the jury was instructed on both theories, each must be supported by adequate evidence to survive a sufficiency challenge. State v. Collins, 76 Wn. App. 496, 501, 886 P.2d 243 (1995).

Rinthalukay does not dispute that the geoduck was improperly tagged. He argues, however, that the State presented no evidence that he, rather than Sea Native, possessed this shellfish. But, Rinthalukay presented this missing evidence himself. Rinthalukay testified he did not know how the untagged

---

[6] Shellfish companies in Washington must follow food and safety regulations established by the NSSP and incorporated into Washington law through WAC 246-282-005.

geoduck was shipped to Rainier Cold Storage. Rinthalukay admitted, however, that "I told my either driver or person who in charge of the house, 'Hey, this has been long time from our warehouse. Get rid of it. I don't care where it go.'" Although RCW chapter 69.30, which governs sanitary control of shellfish, does not define "possess" or "possession," courts have recognized the concept in criminal cases as requiring proof of either actual physical possession or constructive possession through dominion and control. See State v. Shumaker, 142 Wn. App. 330, 334, 174 P.3d 1214 (2007) (constructive possession means no actual physical possession but dominion and control over substance or over the premises on which the substance was found). Rinthaukay had sufficient dominion or control over the geoduck to instruct a driver to dispose of it. Based on this evidence, a rational trier of fact could conclude that Rinthalukay did knowingly "possess" the improperly tagged geoduck.

There was also sufficient evidence to convict Rinthalukay for Sea Native's possession of the untagged geoduck under the accomplice liability statute. Washington's general accomplice liability statute provides that a "person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable." RCW 9A.08.020(1). A "person is legally accountable for the conduct of another person when . . . he or she is made accountable for the conduct of such other person by [Title 9A.08] or by the law defining the crime." RCW 9A.08.020(2)(b).

The State relied on two separate provisions of Title 9A.08 to argue Rinthalukay was liable for Sea Native's possession of geoduck. Under RCW

9A.08.030(3), a person is liable for conduct he performs or causes to be performed in the name of or on behalf of a corporation to the same extent as if such conduct were performed in his own name or behalf. And under RCW 9A.08.030(4), if a corporation has a duty to act, any agent who knows he shares primary responsibility for discharging that duty is liable for recklessly omitting that act to the same extent as if the duty were imposed directly upon the agent. If the agent is a high managerial agent, he is liable for negligently omitting the act.

Despite any legal distinction between Rinthalukay and Sea Native, evidence established Rinthalukay acted as a high managerial agent of Sea Native. Rinthalukay was the owner of Sea Native and was listed with the Washington Secretary of State as its president, chairman, and registered agent. Sea Native had no other full time employees, and Rinthalukay operated the business at least in part from his personal residence, an address he listed with the Secretary of State as an alternative address for the corporation.

In addition, the State produced evidence that as owner of Sea Native, Rinthalukay's job duties included, among other things, managing the plant, overseeing governmental required recordkeeping activities, supervising inventory control, working with tribal fisheries and partners, preparing invoices for customers, and traveling to meet with tribal fishers to receive product. It was Rinthalukay who signed Sea Native applications for its wholesale dealer license and Rinthalukay's buyer license. It was Rinthalukay who telephonically provided Detective Willette with the locked gate code to enter Sea Native's plant to execute the search warrant.

Detective Willette also testified Rinthalukay was responsible for ensuring compliance with Sea Native's recordkeeping obligations. Letters from WDFW—warning Rinthalukay of his failure to comply with fish ticket requirements—were found in an office at Sea Native's plant. Additional warning letters from WDFW were found in Rinthalukay's garage.

According to Department of Health inspector Rob Banes, whenever he conducted an inspection of Sea Native's plant, Rinthalukay was the only person who accompanied him through the plant. He never had interactions with any other managerial employees other than Rinthalukay. Additionally, when Banes conducted an inspection in March 2013, he notified Rinthalukay of the information the Department of Health required him to include on shellfish certification tags and when a certification tag was needed.

This evidence is sufficient to lead a rational jury to find Rinthalukay was legally accountable for Sea Native's failure to properly tag the containers holding geoduck. Thus, we conclude that there was sufficient evidence for the jury to find both that Rinthalukay himself knowingly possessed the improperly tagged geoduck or that Sea Native possessed the improperly tagged geoduck and Rinthalukay was legally accountable for this conduct.

D. Constitutionality of RCW 77.15.630 and RCW 69.30.110

Finally, Rinthalukay contends his convictions for unlawful fish sales accounting and unlawful possession of geoduck should be reversed because the regulations do not sufficiently define who is responsible for the violations—the corporation engaged in commercial fish processing or the individual working for

that corporation. He contends that the statutes at issue, RCW 77.15.630 and RCW 69.30.110, are unconstitutionally vague under the due process clause of the Fourteenth Amendment.

"The due process clause of the Fourteenth Amendment requires that citizens be afforded fair warning of proscribed conduct." City of Spokane v. Douglass, 115 Wn.2d 171, 178, 795 P.2d 693 (1990). A statute is void for vagueness if either "(1) the statute does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is proscribed; or (2) the statute does not provide ascertainable standards of guilt to protect against arbitrary enforcement." State v. Watson, 160 Wn.2d 1, 6, 154 P.3d 909 (2007) (internal quotation marks omitted) (quoting State v. Williams, 144 Wn.2d 197, 203, 26 P.3d 890 (2001)). A statute is unconstitutional if it fails under either prong of this test. Williams, 144 Wn.2d at 204.

We presume statutes are constitutional. State v. Jacobson, 92 Wn. App. 958, 967, 965 P.2d 1140 (1998). Rinthalukay bears the burden of proving beyond a reasonable doubt that a statute is unconstitutionally vague. Id. A vagueness challenge not involving rights protected by the First Amendment must be evaluated in light of the particular facts of each case. Watson, 160 Wn.2d at 6.

The State argues that the regulations and statutes administering commercial fisheries are complicated, but this complexity does not make the laws unconstitutionally vague. We agree. Rinthalukay does not argue that the regulatory complexity makes it impossible to determine what conduct is

prohibited. Instead, he contends the statutory scheme makes it unclear whether only a corporation or its owner can be criminally liable. This argument is not well-founded.

RCW 77.15.630(1)(c) makes it illegal for a licensed wholesale fish buyer to buy or deliver fish or shellfish without delivering a fish receiving ticket to the appropriate regulatory agencies. RCW 69.30.110 makes it unlawful for "any person" to possess a commercial quantity of shellfish when not packed in accordance with that chapter. The general criminal laws explain when an individual will be criminally liable for corporate violations of these two provisions. RCW 9A.08.030(3) provides:

> A person is criminally liable for conduct constituting an offense which he or she performs or causes to be performed in the name of or on behalf of a corporation to the same extent as if such conduct were performed in his or her own name or behalf.

Jury instruction No. 35 reflected this statutory provision. The statutory language is quite clear. If a person buys fish on behalf of a corporation or in the name of the corporation, and then fails to deliver the requisite fish ticket, he can be held criminally liable for this act under RCW 77.15.630(1)(c). Similarly, under RCW 69.30.110, if a person takes possession of a commercial quantity of fish on behalf of or in the name of a corporation, and fails to ensure it is properly tagged, he can be held criminally liable for this act.

RCW 9A.08.030(4) provides:

> Whenever a duty to act is imposed by law upon a corporation, any agent of the corporation who knows he or she has or shares primary responsibility for the discharge of the duty is criminally liable for a reckless or, if a high managerial agent, criminally

- 20 -

negligent omission to perform the required act to the same extent as if the duty were by law imposed directly upon such agent.

Instruction Nos. 39 through 41 advised the jury on this statutory provision and provided definitions of "agent," "high managerial agent," recklessness, and criminal negligence. This provision is also clear—if an agent of a corporation knows he has primary responsibility for discharging the corporation's duty to send fish tickets to WDFW or to verify accurate tagging of geoduck, and is reckless in discharging this duty, he can be liable. If the person holds a "high managerial" position within the corporation, a criminally negligent failure to act suffices to impose liability.

We conclude that by reading RCW 9A.08.030 in conjunction with RCW 77.15.630 and RCW 69.30.110, the statutes define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is proscribed. As a result, the statutes provide ascertainable standards of guilt to protect against arbitrary enforcement and are not unconstitutionally vague.

We reverse Rinthalukay's identity theft conviction and affirm his convictions for unlawful fish sales accounting and unlawful possession of geoduck.

Andrus, J.

WE CONCUR:

Mann, ACJ

Verellen, J.

- 21 -