IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, Respondent, v. HEATHER D. TROUTMAN, Appellant. | No. 84054-1-I DIVISION ONE UNPUBLISHED OPINION |

CHUNG, J. — Heather Troutman was convicted of felony driving under the influence (DUI) following a trial in which the key issue was whether she was the driver of a car that was found off the road. On appeal, she challenges the admission of her statements in violation of the doctrine of corpus delicti, the sufficiency of the evidence to support her conviction, and the admission of evidence that she refused to take a breath test in violation of CrR 3.1 and article I, section 7 of Washington's Constitution. She also challenges her sentence based on the imposition of supervision fees, the calculation of her offender score because it included her juvenile dispositions, and the imposition of the Victim Penalty Assessment (VPA). We affirm her conviction. However, we remand to the trial court to strike the supervision fees and the VPA from her sentence.

FACTS

Sometime after 11 p.m. on May 30, 2019, Jennifer Moldver took the North Lake Samish exit off Interstate 5 near Bellingham and encountered a car that had

gone "off the off ramp into the brush and woods," still running, with its lights still on. Moldver immediately pulled over, called 911, and walked toward the car, where she watched "one person in the car in the driver's seat . . . rummage around a little bit and then climb over to the passenger seat and exit the vehicle." While she was on the phone, the person who had exited the car, Troutman, approached her and "begg[ed]" Moldver not to call 911. Moldver testified that "the alcohol smell coming off her was very, very powerful."

An emergency medical technician (EMT) who responded to the scene two minutes later could smell alcohol on Troutman. Troutman told the EMT "I wasn't driving," "I'm not supposed to be driving," and "Please don't tell them I was driving."

A Washington State Patrol trooper, Officer Lipton, responded to the scene approximately ten or fifteen minutes after the 911 call was made. It appeared to Lipton that the car had skidded off the roadway, slid though grass, and ended up in roadside brush. Lipton testified that when he asked her what happened, Troutman immediately told him "she wasn't driving." Lipton further testified that Troutman failed seventeen of eighteen field sobriety test clues, and she told him that she thought if she took a breath test, her score would be "very high." Lipton placed Troutman under arrest and apprised her of her <u>Miranda</u>[1] rights at the scene.

---

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

2

The accident occurred in a "fairly remote" part of the county with "no houses in the immediate area" and only a park and ride lot and a gas station on the other side of the freeway. Moldver, the EMT, and Lipton did not see anyone else at the scene. The keys were still in the car's ignition, and Lipton observed the driver's seat was in a position consistent with a driver of Troutman's height, which was five feet, four inches.

After transporting her to jail, Lipton began the breath test procedure, but Troutman said she did not want to answer any further questions and asked for an attorney. After Lipton attempted to put her in touch with an attorney, he resumed the breath test procedure. Troutman refused to take the test.

In June 2019, the State charged Troutman with several crimes, including felony DUI. Later that year, her first trial ended in a mistrial.

In February 2022, the State amended the information to a single count of felony DUI. Before her second trial, Troutman stipulated to prior convictions that would elevate the charge to felony DUI. See RCW 46.61.5055. The State moved to admit several statements by Troutman under CrR 3.5. Following the CrR 3.5 hearing,[2] the court entered a written order admitting Troutman's statements to the EMT and Lipton prior to her arrest, but excluding her statements at jail except for the fact of her refusal to take a breath test.

---

[2] The court's written findings of fact and conclusions of law from the CrR 3.5 hearing were not filed until after the trial, the same day as the judgment and sentence, on March 23, 2022.

At trial, after the State rested, Troutman moved to dismiss the charges against her based on the insufficiency of its evidence against her and the corpus delicti doctrine. The court denied the motion.

The jury found Troutman guilty as charged. Troutman timely appealed.

DISCUSSION

I.      Admission of Statements and Corpus Delicti Doctrine

Troutman argues that her statements were not admissible under the corpus delicti doctrine. We disagree.

"Corpus delicti means the 'body of the crime.' " State v. Brockob, 159 Wn.2d 311, 327, 150 P.3d 59 (2006) (quoting State v. Aten, 130 Wn.2d 640, 655, 927 P.2d 210 (1996) (internal quotation marks omitted)). "[T]he underlying purpose of corpus delicti is to prevent convictions based solely on confessions." State v. Cardenas-Flores, 189 Wn.2d 243, 260, 401 P.3d 19 (2017).

"The corpus delicti 'must be proved by evidence sufficient to support the inference that' a crime took place, and the defendant's confession 'alone is not sufficient to establish that a crime took place.' " Cardenas-Flores, 189 Wn.2d at 252 (quoting Brockob, 159 Wn.2d at 327-28). "Washington case law treats corpus delicti as a rule of sufficiency, not merely a rule of evidence." Cardenas-Flores, 189 Wn.2d at 257. We review de novo the sufficiency of the evidence for purposes of corpus delicti. State v. Sprague, 16 Wn. App. 2d 213, 226, 480 P.3d 471 (2021). "In determining whether there is sufficient evidence of the corpus delicti independent of the defendant's statements, we assume the 'truth of the State's evidence and all reasonable inferences from it in a light most favorable to

4

the State.' " Cardenas-Flores, 189 Wn.2d at 264 (quoting Aten, 130 Wn.2d at 658).

For the charge of driving while intoxicated, the corpus delicti "is met by proof that petitioners were driving or in actual physical control of a vehicle while intoxicated." City of Bremerton v. Corbett, 106 Wn.2d 569, 578, 723 P.2d 1135 (1986). "Inherent in the offense is the requirement that the intoxicated person was the driver . . . the corpus delicti of the offense[ ] . . . cannot be established absent proof connecting [a defendant] with operation or control of a vehicle while intoxicated." Id. at 574.

"Under the Washington rule . . . the evidence must independently corroborate, or confirm, a defendant's" confession. Brockob, 159 Wn.2d at 328-29. "The independent evidence need not be of such a character as would establish the corpus delicti beyond a reasonable doubt, or even by a preponderance of the proof. It is sufficient if it *prima facie* establishes the *corpus delicti*." State v. Meyer, 37 Wn.2d 759, 763-64, 226 P.2d 204 (1951), quoted in Cardenas-Flores, 189 Wn.2d at 258. "Prima facie corroboration . . . exists if the independent evidence supports a 'logical and reasonable inference of the facts' " that the State seeks to prove. Brockob, 159 Wn.2d at 328 (internal quotation marks omitted) (quoting Aten, 130 Wn.2d at 656). The independent evidence also " 'must be consistent with guilt and inconsistent with a[ ] hypothesis of innocence.' " Cardenas-Flores, 189 Wn.2d at 264 (quoting Brockob, 159 Wn.2d at 329).

At trial, Troutman testified that she was not the driver, her friend Noell was. Troutman argues there is no direct evidence she was the driver because no one saw her driving that night. But "[t]he *corpus delicti* can be proved by either direct or circumstantial evidence." Aten, 130 Wn.2d at 655. Troutman further argues the evidence did not establish the corpus because the car's driver seat position was not measured and no dog was called to search the area for Noell and his friend, who she testified had joined them on the way back from Seattle and was in the back seat. She also points to the lack of evidence that she was the car's registered owner, distinguishing Corbett and other cases where the defendants were the registered owners. However, none of these specific types of evidence is needed, as long as other independent evidence is sufficient to support a "logical and reasonable inference" that Troutman was the car's driver. Brockob, 159 Wn.2d at 328.

Troutman relies primarily on Sprague, 16 Wn. App. 2d at 213, to argue that the independent evidence is "not inconsistent with a hypothesis of innocence," and it would not be "an unreasonable hypothesis to conclude that Ms. Troutman was not the driver." In Sprague, the defendant was found guilty of one count of possession with intent to deliver methamphetamine. Id. at 225. At the scene, Sprague was in possession of nine to 10 grams of methamphetamine, and officers found a homemade pipe, a weighing scale, and "a bundle of plastic grocery bags." Id. at 230. That amount of methamphetamine was not sufficient to support an inference of intent to deliver. Id. The State argued the evidence of intent was the scales and the grocery bags. Id.

The Sprague court reasoned the scales could be consistent with both an intent to deliver and personal use. Id. As for the bags, officers testified that while methamphetamine is typically packaged in small ziplock-style bags, plastic grocery bags were also commonly used and are torn or cut and tied or melted around the methamphetamine. Id. However, the plastic grocery bags in Sprague's apartment were not torn into small pieces or wrapped around methamphetamine. Id. at 231. Moreover, "Sprague was using one of the grocery bags as a garbage can liner." Id. Thus, the court reasoned that the presence of the scale and grocery bags "is 'no more indicative of an intent to deliver than . . . mere possession,' " so the evidence was "insufficient to establish corpus delicti of the specific crime of possession with intent to deliver." Id. at 231-32 (quoting State v. Cobelli, 56 Wn. App. 921, 925, 788 P.2d 1081 (1989)).

Unlike the independent evidence in Sprague, which was consistent with both mere possession and with possession with intent to deliver, here, the independent evidence is inconsistent with the conclusion that Troutman was not the driver. Moldver observed a single person, Troutman, in the car's driver's seat. The car was still running, and the keys were still in the car's ignition, so the logical and reasonable inference is that the accident had just happened when Moldver encountered the car. Moldver and the EMT, who arrived within two minutes of the 911 call, observed no other persons at the scene. Though Troutman testified Noell and his friend had been in the car, she did not ask for help finding them at the scene. As the area was remote, it was a reasonable inference that no one else had been the driver and had left the scene. Lipton,

7

who arrived ten or fifteen minutes after the 911 call, found the keys still in the car and observed that the car's seat was adjusted to fit a person of Troutman's height. Lipton also observed no other people at the remote scene who could have been the car's driver.

Viewed in the light most favorable to the State, the evidence independent of Troutman's statements supports a logical and reasonable inference that Troutman was the car's driver. Therefore, we conclude that the corpus delicti rule is satisfied.

## II.    Sufficiency of the Evidence

Troutman argues that the evidence is insufficient to support her conviction "for the same reason the evidence was insufficient to corroborate Ms. Troutman's statements." We disagree and conclude that the evidence is sufficient to support her conviction.

 "Evidence is sufficient to support a guilty verdict if any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the elements of the charged crime beyond a reasonable doubt." Cardenas-Flores, 189 Wn.2d at 265. "A claim of evidentiary insufficiency admits the truth of the State's evidence and all reasonable inferences from that evidence." State v. Rodriquez, 187 Wn. App. 922, 930, 352 P.3d 200 (2015). "[U]nlike the corpus delicti analysis, the sufficiency of the evidence analysis does not involve evaluation of hypotheses of innocence." Sprague, 16 Wn. App. 2d at 235.

To prove the crime of felony DUI, the State had to prove that Troutman drove a motor vehicle while under the influence of or affected by intoxicating

liquor and had three or more prior offenses within 10 years. RCW 46.61.502(1), (6)(a). Troutman stipulated to the prior convictions necessary for a felony DUI charge under RCW 46.61.502(6)(a). She testified that she had four cups of a "strong" drink with fruit in it from a punchbowl before leaving a party around 11 p.m. and was intoxicated on the night in question. Further, Moldver and the EMT testified that Troutman smelled of alcohol.

The key contested issue was whether Troutman was the driver. Troutman testified that "[she] was not" the car's driver, that the car was her godfather's, and that she allowed her friend Noell to drive the car. But on review for sufficiency of the evidence, we must view the evidence in the light most favorable to the State. See Cardenas-Flores, 189 Wn.2d at 265. As discussed above, not only Troutman's statements, but independent corroborating evidence supported the inference that Troutman was the car's driver. We conclude that any rational trier of fact viewing the evidence in the light most favorable to the State would find the elements of the charged crime beyond a reasonable doubt.

### III. CrR 3.1 Right to Counsel

Troutman argues the trial court violated her CrR 3.1 right to an attorney by admitting evidence that she refused to take a breath test after Lipton failed to make reasonable efforts to put her in contact with an attorney. The State counters that the issue is not properly before this court under RAP 2.5 because Troutman did not raise CrR 3.1 below, and the violation of a court rule cannot be manifest error affecting a constitutional right. We agree with the State.

9

CrR 3.1 provides a statutory right to counsel that extends "beyond the requirements" of our federal or state constitutions. State v. Templeton, 148 Wn.2d 193, 211, 59 P.3d 632 (2002) (quoting Heinemann v. Whitman County, 105 Wn.2d 796, 802, 718 P.2d 789 (1986)). The rule-based right to an attorney accrues "as soon as feasible after the defendant is taken into custody." CrR 3.1(b)(1). "At the earliest opportunity a person in custody who desires a lawyer shall be provided access to a telephone, the telephone number of the public defender or official responsible for assigning a lawyer, and any other means necessary to place the person in communication with a lawyer." CrR 3.1(c)(2). The rule does not require police to actually connect the accused with an attorney, but it does require the police to make reasonable efforts to assist the person in contacting an attorney at the earliest opportunity. State v. Pierce, 169 Wn. App. 533, 548, 280 P.3d 1158 (2012).

At the CrR 3.5 hearing, Troutman argued that "although [Lipton] did make his best efforts to contact an attorney[,] they were ultimately not successful, [and] at that point she had invoked her right to an attorney and the questioning needed to stop" because "her right to counsel is a constitutional right." But Troutman never cited CrR 3.1; she argued that Lipton "violate[d] her *constitutional right* to counsel." Rep. of Proc. at 53 (emphasis added).

The court concluded that Troutman "invoked her right to an attorney when she requested to speak to a public defender at the station." It further concluded her statements "made in response to questions on the 'DUI packet' " after she invoked her right to counsel were inadmissible, except for her refusal to take the

breath test.[3] The court's written findings of fact and conclusions of law following the hearing are silent about CrR 3.1.

RAP 2.5 generally prohibits our review of errors not raised below. RAP 2.5(a). However, this court has discretion to reach an issue not raised at trial if the party seeking review demonstrates manifest error affecting a constitutional right. RAP 2.5(a)(3). The defendant has the burden to identify the constitutional error and how it actually prejudiced their defense. State v. McDonald, 138 Wn.2d 680, 691, 981 P.2d 443 (1999). "Manifest" means actual prejudice. State v. Walsh, 143 Wn.2d 1, 8, 17 P.3d 591 (2001).

A violation of CrR 3.1 is not of "constitutional dimension" for the purposes of RAP 2.5(a)(3). State v. Guzman-Cuellar, 47 Wn. App. 326, 334, 734 P.2d 966 (1987) (CrR 3.1 is a court rule "not of constitutional origin"); State v. Clark, 48 Wn. App. 850, 863, 743 P.2d 822 (1987) (same). Because Troutman did not raise CrR 3.1 below and it is not manifest constitutional error, we decline to review Troutman's claim of a CrR 3.1 violation.[4]

---

[3] Here, as Troutman notes, "[t]he trial court excluded Ms. Troutman's responses to other questions . . . because she had invoked her right to counsel under Miranda," and Miranda protections do not extend to refusals to take breath tests because refusal is a non-testimonial act. See South Dakota v. Neville, 459 U.S. 553, 564 n.15, 103 S. Ct. 916, 74 L. Ed. 2d 748 (1983) ("In the context of an arrest for driving while intoxicated, a police inquiry of whether the suspect will take a blood-alcohol test is not an interrogation within the meaning of Miranda."); State v. Zwicker, 105 Wn.2d 228, 243, 713 P.2d 1101 (1986) ("[T]here is no coercion in obtaining refusal evidence where the accused is fully informed of the consequences of exercising the statutory right of refusal.").

[4] While we decline to review this claim, we note that Troutman does not assign error to the court's failure to include a conclusion of law regarding CrR 3.1. Moreover, a violation of a court rule such as CrR 3.1 is harmless if there is no reasonable probability that the error materially affected the outcome of the trial. Templeton, 148 Wn.2d at 220. In this case, Troutman failed seventeen of eighteen field sobriety test clues, she told Lipton at the scene voluntarily that if she took a breath test, the result "would be very high," and she testified that she was intoxicated that night, so there is no reasonable probability of a materially different outcome had the evidence of her refusal to take the breath test been excluded.

IV.     Article I, Section 7

Washington's implied consent statute provides that any person who operates a motor vehicle within this state is deemed to have given consent to breath tests to determine alcohol concentration if the arresting officer has reasonable grounds to believe the person has been driving under the influence. RCW 46.20.308(1). Prior to obtaining a breath sample, the officer must advise the driver that he or she still has the right to refuse to consent to the test, but that license revocation and use of that refusal at trial are among the consequences that follow if the driver declines the test. RCW 46.20.308(2).

Troutman argues that the admission of her refusal to take a breath test violates article I, section 7 of the Washington Constitution.[5] The State argues Troutman did not raise this issue below and cannot meet her burden under RAP 2.5(a)(3) to show manifest error affecting a constitutional right. We agree with the State.

At her CrR 3.5 hearing, Troutman did not challenge the implied consent statute's authorization of a warrantless breath test as a violation of article I, section 7. Under RAP 2.5(a), we will not review claims not raised before the trial court unless the party seeking review demonstrates a manifest error affecting a constitutional right.

---

[5] Troutman correctly notes that she did not need to brief an analysis under State v. Gunwall, 106 Wn.2d 54, 720 P.2d 808 (1986), because the Washington Supreme Court has already held that article I, section 7 provides privacy protection more extensive than the Fourth Amendment. See State v. Mayfield, 192 Wn.2d 871, 880, 434 P.3d 58 (2019).

Troutman makes only a conclusory statement that "[t]he record is adequate to address the claim and the claimed error is of constitutional dimension. Therefore, the issue is properly before this Court." But Troutman does not provide argument demonstrating a manifest constitutional error under RAP 2.5(a)(3). "This court will not consider claims insufficiently argued by the parties." State v. Elliott, 114 Wn.2d 6, 15, 785 P.2d 440 (1990). We decline to reach the claim that admission of Troutman's refusal to take a breath test, as allowed under the implied consent statute, violates article 1, section 7.[6]

V.      Supervision Fees

Troutman argues her judgment and sentence includes community custody supervision fees that the court intended to waive. When she was sentenced in March 2022, Troutman asked the court to find her indigent and waive non-mandatory fines and fees. The State did not object. The court found her indigent and stated, "My intent is to waive whatever I can." The statute in effect at the time, former RCW 9.94A.703(2)(d) (2018), allowed courts to waive supervision fees for community custody.[7] Regardless, Troutman's judgment and sentence

---

[6] We note that even if we were to reach her claim, this court has already addressed this precise issue in State v. Nelson, 7 Wn. App. 2d 588, 605, 434 P.3d 1055 (2019). Nelson examined State v. Baird, 187 Wn.2d 210, 386 P.3d 239 (2016), in which a majority of the court concluded that a breath test conducted under Washington's implied consent law is a valid search incident to arrest. Nelson, 7 Wn. App. 2d at 600. After conducting an analysis under State v. Gunwall, 106 Wn.2d 54, 720 P.2d 808 (1986), the Nelson majority held that, "in light of the long history of both our implied consent statute and of our case law rejecting arguments for giving art. I, § 7 an expanded interpretation . . . [w]e therefore conclude that the implied consent law provides authority of law to conduct a warrantless breath test as a search incident to arrest." Id. at 605.

[7] The current RCW 9.94A.703(2), which went into effect in June 2022, omits those fees altogether.

included a provision that she "pay supervision fees as determined by" the Department of Corrections while on community custody.

The State concedes remand is appropriate because the trial court did not intend to impose supervision fees. We accept the State's concession and remand to the trial court to strike the community custody supervision fee.

VI.     Inclusion of Juvenile Dispositions in Offender Score Calculation

Troutman's statement of additional grounds states her belief that her "juv[enile] record should not have been counted against me as points." She attaches her criminal history and the court's sentencing data showing an offender score of six. The standard range for her level IV offense is 33 to 48 months, and the court sentenced her to 35 months. Her juvenile dispositions contributed two points to her offender score. WASH. STATE CASELOAD FORECAST COUNCIL, 2022 WASHINGTON STATE ADULT SENTENCING GUIDELINES MANUAL 311 (2022), https://cfc.wa.gov/sites/default/files/Publications/Adult_Sentencing_Manual_2022.pdf [https://perma.cc/9ZJX-45RC]. Removing her juvenile dispositions would reduce her offender score to four and the standard range to fifteen to twenty months. Id.

At the time of Troutman's sentencing, the Sentencing Reform Act (SRA), RCW 9.94A.589(1)(a), required juvenile dispositions to be counted when calculating an offender score subject only to the same limitations that apply to adult convictions. But pursuant to Engrossed House Bill (EHB) 1324, 68th Leg. (Wash. 2023), a new provision effective July 23, 2023, states: "For the purposes

14

of this section, adjudications of guilt pursuant to Title 13 RCW[8] which are not murder in the first or second degree or class A felony sex offenses may not be included in the offender score." LAWS OF 2023, ch. 415, § 2 (codified at RCW 9.94A.525(1)(b)).

Sentences imposed under the SRA of 1981, ch. 9.94A RCW, "are generally meted out in accordance with the law in effect at the time of the offense. See RCW 9.94A.345[9]; RCW 10.01.040.[10]" State v. Jenks, 197 Wn.2d 708, 714, 487 P.3d 482 (2021). Because " 'the fixing of legal punishments for criminal offenses is a legislative function,' . . . [i]t is therefore 'the function of the legislature and not the judiciary to *alter* the sentencing process.' " Id. at 713 (internal quotation marks omitted) (quoting State v. Ammons, 105 Wn.2d 175, 180, 713 P.2d 719 (1986), abrogated on other grounds by Washington v.

---

[8] The title of Title 13 RCW is "Juvenile Courts and Juvenile Offenders."

[9] RCW 9.94A.345 states, "Any sentence imposed under this chapter shall be determined in accordance with the law in effect when the current offense was committed."

[10] RCW 10.01.040 states in relevant part:

> Whenever any criminal or penal statute shall be amended or repealed, all offenses committed or penalties or forfeitures incurred while it was in force shall be punished or enforced as if it were in force, notwithstanding such amendment or repeal, unless a contrary intention is expressly declared in the amendatory or repealing act, and every such amendatory or repealing statute shall be so construed as to save all criminal and penal proceedings, and proceedings to recover forfeitures, pending at the time of its enactment, unless a contrary intention is expressly declared therein.

This "savings clause" was enacted to " 'render[] unnecessary the incorporation of an individual saving clause in each statute which amends or repeals an existing penal statute.' " Jenks, 197 Wn.2d at 719 (quoting State v. Hanlen, 193 Wash. 494, 497, 76 P.2d 316 (1938)) (internal quotation marks omitted). Thus, in Jenks, the court held that where the plain language—there, an amendment to the Persistent Offender Accountability Act, LAWS OF 2019, ch. 187, § 1(33)(o), part of the SRA—did not convey the intent for the bill to be retroactive, or to be excluded from the savings clause, the amendment applied only prospectively. Id. at 714, 720. Similar to the amendment at issue in Jenks, here, where the amendment to the SRA includes no contrary intent, the savings clause applies.

Recuenco, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006)). Thus, to determine whether the newly amended statute relating to Troutman's sentence applies, we must interpret the statute based on its plain language, including that of the amendments. Jenks, 197 Wn.2d at 714. If unambiguous, the plain language provides "the beginning and the end of the analysis." Id.[11]

The amendment has the effect of removing a person's prior juvenile dispositions from use when calculating a person's offender score for any subsequent adult convictions, except for juvenile adjudications of guilt for murder in the first degree, murder in the second degree, and class A felony sex offenses. Troutman points to the intent section of the amending law to support her argument that the plain language "expresses an intent to apply to pending cases that are not final." The intent section states

> The legislature intends to:
> (1) Give real effect to the juvenile justice system's express goals of rehabilitation and reintegration;
> (2) Bring Washington in line with the majority of states, which do not consider prior juvenile offenses in sentencing range calculations for adults;
> (3) Recognize the expansive body of scientific research on brain development, which show that adolescent's perception, judgment, and decision making differs significantly from that of adults;

---

[11] Troutman also argues that the statute is remedial, and thus requires liberal construction to effectuate the remedial purpose of the statute. While the Jenks court did not address this argument, it did nevertheless interpret the statute at issue in that case not to express an intent to apply retroactively. And as the State notes, this court in Jenks at the appellate level rejected a similar argument, holding that the general rule that a remedial statute applies retroactively "does not apply when a statute is subject to RCW 10.01.040," and " '[a]bsent language indicating a contrary intent, an amendment to a penal statute – even a patently remedial one – must apply prospectively under RCW 10.01.040.' " State v. Jenks, 12 Wn. App. 2d 588, 600, 459 P.3d 389 (2020) (quoting State v. McCarthy, 112 Wn. App. 231, 237, 48 P.3d 1014 (2002)), aff'd, 197 Wn.2d 708, 487 P.3d 482 (2021).

    (4)  Facilitate the provision of due process by granting the procedural protections of a criminal proceeding in any adjudication which may be used to determine the severity of a criminal sentence; and

    (5)  Recognize how grave disproportionality within the juvenile legal system may subsequently impact sentencing ranges in adult court.

LAWS OF 2023, ch. 415, § 1. Troutman argues that this section "uses strong words that convey an intent" for the law to apply to all pending cases. But the plain language says nothing about retroactivity.

Because the plain language is unambiguous and does not evince a legislative intent for EHB 1324 to apply retroactively, we conclude that under the SRA, RCW 9.94A.345, and the savings clause, RCW 10.01.040, the law in effect at the time of the offense applies to Troutman's sentence.

Finally, Troutman argues that EHB 1324 should apply prospectively. " '[A] statute applies prospectively,' rather than retroactively, 'if the precipitating event under the statute occurred after the date of enactment.' " Jenks, 197 Wn.2d at 722 (quoting In re Pers. Restraint of Carrier, 173 Wn.2d 791, 809, 272 P.3d 209 (2012)). "To determine what event precipitates or triggers application of the statute, we look to the subject matter regulated by the statute." Carrier, 173 Wn.2d at 809, quoted in Jenks, 197 Wn.2d at 722.

In support of her argument, Troutman cites to State v. Ramirez, in which the court held that an amendment to the criminal filing fee statute applied prospectively because the precipitating event was "the termination of all appeals, at which point the costs were finalized. 191 Wn.2d 732, 749, 426 P.3d 714 (2018). But in Ramirez, the subject matter was "costs imposed upon conviction."

17

191 Wn.2d at 749. The <u>Jenks</u> court "decline[d] to expand <u>Ramirez</u>" as it was "not analogous to the determination of whether a defendant qualifies as a persistent offender," <u>Jenks</u>, 197 Wn.2d at 723, a determination that is regulated by the Persistent Offender Accountability Act and the SRA. <u>Id.</u> at 722.

Here, the statute at issue regulates which prior offenses are included in an offender score calculation, so the triggering event is sentencing. <u>See</u> <u>State v. Jefferson</u>, 192 Wn.2d, 225, 247-49, 429 P.3d 467 (2018). Because Troutman's sentence is still on direct appeal, the amendment would apply prospectively *if* the savings clause did not apply. But the plain language of EHB 1324 conveys no intent that it applies retroactively. <u>See</u> <u>Jenks</u>, 197 Wn.2d at 715-19. Thus, as analyzed above, we hold that the amendment does not apply to the calculation of Troutman's offender score.

VII.  <u>Victim Penalty Assessment (VPA)</u>

After Troutman appealed and filed her opening brief, the Legislature passed Engrossed Substitute House Bill (ESHB) 1169. LAWS OF 2023, ch. 449. The court in <u>State v. Ellis</u> described this new law as follows:

> ESHB 1169 added a subsection to RCW 7.68.035 that prohibits courts from imposing the VPA on indigent defendants as defined in RCW 10.01.160(3). LAWS OF 2023, ch. 449 § 1; RCW 7.68.035(4). The amended statute also requires trial courts to waive any VPA imposed prior to the effective date of the amendment if the offender is indigent, on the offender's motion. LAWS OF 2023, ch. 449 § 1; RCW 7.68.035(5)(b). This amendment will take effect on July 1, 2023. LAWS OF 2023, ch. 449 § 1.

27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023). The new provision applies to cases pending on direct appeal. <u>Id.</u> (citing <u>Ramirez</u>, 191 Wn.2d at 748-49).

The trial court found Troutman indigent. Based on ESHB 1169, Troutman moves this court to strike the VPA from her sentence. The State has indicated it has "no objection to striking the [VPA] during the course of Troutman's appeal rather than requiring her to file a motion." We remand with instructions to strike the VPA.

CONCLUSION

We affirm Troutman's felony DUI conviction and remand to the trial court to strike from her sentence the community custody supervision fee and the VPA.

_Chung, J._

WE CONCUR:

_Feldman, J._                    _Díaz, J._